John **PADBERG**, Clifford **Paolillo** and Rashid **Ahmed**, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Diane **MCGRATH–MCKECHNIE**, Rudolph W. **Giuliani**, Joseph **Mckay**, Matthew **Daus**, Harry **Rubinstein**, Elliot **Sander**, Harvey **Giannoulis**, Marvin **Greenberg**, Ramona **Whaley** and the **New York City Taxi and Limousine Commission**, Defendants.

No. 00 CV 3355.

United States District Court, E.D. New York.

Aug. 14, 2000.

Daniel L. Ackman, Brad E. Mazarin, New York City, for plaintiffs.

Jerald Horowitz, Assistant Corporation Counsel, New York City, for defendants.

### MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiffs John Padberg ("Padberg"), Clifford Paolillo ("Paolillo") and Rashid Ahmed ("Ahmed") bring this motion on behalf of themselves and a putative class of taxicab drivers, seeking a temporary restraining order and a preliminary injunction prohibiting defendant New York City Taxi and Limousine Commission ("TLC") from revoking Paolillo's and Ahmed's licenses, and directing TLC to reinstate Padberg's license. For the reasons set forth below, plaintiffs' motion is denied.

### BACKGROUND

This case stems from TLC's highly publicized initiative aimed at eradicating racial bias from New York City's fleet of licensed taxicab drivers. Since November 1999, TLC has attempted to achieve the worthy objectives of removing from the streets any taxicab driver found to have refused service for racially motivated reasons, and deterring other drivers from engaging in similar, racially-based refusals. In pursuing these goals, TLC has imposed summary suspensions and severe penalties on many New York City taxicab drivers, including the three plaintiffs in this case, who now challenge TLC's procedures. As neither plaintiffs nor TLC sought the opportunity to present testimony or other evidence, the facts of this case are set forth below as they have been discerned from the parties' papers and from oral argument.

In 1996, TLC initiated Operation Refusal, a program to enforce its rules against all kinds of service refusals. As set forth in the § 2–50(b) of the Taxicab Drivers Rules, "[a] driver shall not refuse by words, gestures or any other means . . . to take any passenger to any destination within the City of New York, the counties of Westchester or Nassau or Newark Airport." 35 RCNY § 2–50(b). However, numerous complaints indicating pervasive non-compliance with this provision led to the development of Operation Refusal, which relies on undercover police officers and TLC agents who pose as prospective passengers attempting to hail taxicabs. These agents issue summonses to any driver who does not stop in response to their hails, or who refuses to take them to any requested destination as required by § 2–50(b).

Sections 2–86 through 2–88 of the Taxicab Drivers Rules set forth the penalties for violations of TLC rules. Section 2–87(a)(1) lists the mandatory penalties for service refusals: a first offense "shall be fined not less than $200.00 nor more than $350.00"; a second offense within two years "shall be fined not less than $350.00 nor more than $500.00," with the possibility, at the TLC Chairperson's discretion, of a suspension not to exceed thirty days; and a third offense within three years will result in the revocation of the taxicab driver's license. 35 RCNY § 2–87(a)(1).

Discretionary penalties may also be imposed for service refusal. After listing the mandatory penalties, § 2–87(a)(1) goes on to state that "[n]othing contained herein shall limit or restrict any other authority the Commission may have to suspend or revoke a driver's license." Similarly, § 2–88, provides that

> [v]iolation of any of these rules [including § 2–50(b) ] may also lead to revocation or suspension of a taxicab driver's license and/or fines in excess of those set forth in the above rules 2–86 and 2–87, as provided in the "Procedures In The Event Of A Violation Of Commission Rules."

35 RCNY § 2–88. These procedures were described in the former § 2–85, which was repealed on December 31, 1999, and which stated that

[i]n addition to the mandatory revocation provided for violation [of § 2–50(b), et al.,] the Commission may institute proceedings to revoke a taxicab driver's license for violation of any of these rules when in the determination of the Commission such a proceeding is warranted. 35 RCNY § 2–85(h) (repealed 1999). Subsection (h) also specified that under these circumstances, special hearings would be held before administrative law judges ("ALJ"s) of the New York City Office of Administrative Trials and Hearings ("OATH").

On January 1, 2000, Title 35, § 8 of the Rules of the City of New York, which deals with adjudications, was amended to include some of the substance of the former § 2–85 (the "2000 Amendments"). Although § 8–03(b), unlike § 2–85, makes no specific reference to service refusal or § 2–50(b), it generally provides that "[i]n the alternative to any specific penalties set forth in the Commission Rules, the Commission may, in its discretion, impose a penalty of license revocation, license suspension of up to six (6) months and/or a fine ..." 35 RCNY § 8–03(b). Additionally, the 2000 Amendments made some changes to the adjudicative hearing process. While the former § 2–85(h) had required all discretionary revocation hearings to be held before OATH ALJs, § 8–14(b) requires OATH ALJs to hear only those cases in which "the Commission seeks the penalty of revocation for a rule violation not providing for discretionary or mandatory revocation as a penalty," pursuant to § 8–03(b). 35 RCNY § 8–14(b). All other revocation hearings may be heard by ALJs from TLC's own Adjudications Tribunal. *See id.*

The 2000 Amendments to the TLC rules were apparently intended to implement TLC's decision, made several months earlier, to crack down on service refusals motivated by racial bias. On November 11, 1999, defendant Diane McGrath–McKechnie ("McGrath–McKechnie"), Chairperson of TLC, declared racially-motivated service

refusals to be actions against the public health, safety and welfare, thereby invoking her emergency authority, pursuant to the former § 2–85(i) (repealed 1999) (now recodified as 35 RCNY § 8–16(a)) to "order the summary suspension of [taxicab drivers' licenses], pending revocation proceedings." (Mazer Aff. ¶ 7.)

Following this public announcement, TLC agents began to implement a newly invigorated Operation Refusal. They began to issue summonses to drivers charged with service refusals for violating, not only § 2–50(b), but also § 2–61(a)(2), which prohibits "any willful act of omission or commission which is against the best interests of the public." 35 RCNY § 2–61(a)(2). As set forth in § 2–86, this provision carries with it the penalties of a $150–$350 fine and/or a suspension of up to thirty days, or revocation. Furthermore, TLC agents began to summarily suspend the licenses of these drivers, and to confiscate their cars for safekeeping, pending retrieval by drivers holding valid TLC licenses.

The TLC agents execute the summary suspensions on the spot, according the taxicab drivers no prior notice or opportunity to be heard. TLC rules do provide for prompt post-suspension hearings. The exact nature of these hearings, however, is the subject of some confusion. Section 8–16(b) of the TLC rules states that proceedings for license revocation "shall be initiated within five (5) calendar days of the summary suspension." 35 RCNY § 8–16(b). These proceedings presumably include a full hearing on the merits before an ALJ, and finally determine whether a driver's license will be revoked. But Section 8–16(c) describes an alternative procedure, in which a taxicab driver can challenge the actual suspension, by requesting a hearing within five days of its occurrence. *See* 35 RCNY § 8–16(c). This "summary suspension hearing" takes place within ten days of the driver's request, *see id.*, and is conducted by an ALJ instructed to consider "relevant evidence and testimony under oath," 35 RCNY § 8–16(d).

What the "relevant evidence" consists of is not defined in this section, although at oral argument before the Court on June 29, 2000, counsel for TLC acknowledged that at a "summary suspension hearing," the ALJ does little more than check that the summons was issued properly, and review the taxicab driver's record for prior violations. (Tr. at 9, 16.) Additionally, while § 8–16(d) permits the presentation of affirmative defenses set forth in New York City Administrative Code § 19–512.1, namely that the driver did not know or have reason to know of the acts on which the suspension is based, plaintiffs allege that they were not allowed to offer any evidence at their "summary suspension hearings."

Like the nature of the hearings, the duration of the summary suspension is also unclear. Section 8–16(f) provides that following a "summary suspension hearing," the TLC Chairperson has sixty days to decide whether to uphold the summary suspension. If the Chairperson does not render a decision, then the suspension is lifted until such time as she does. *See* 35 RCNY § 8–16(f). However, in the event that the Chairperson upholds the suspension, § 8–16 is silent as to how long the suspension may continue while the taxicab driver awaits his revocation hearing, or how long it may persist following a revocation hearing, pending the Chairperson's decision whether to revoke the driver's license.

In the context of Operation Refusal and its complex regulatory scheme, TLC summarily suspended plaintiffs Ahmed's and Padberg's licenses.[1] The facts of their individual cases are set forth briefly below.[2]

1. Although Clifford Paolillo is a named plaintiff in this action, no information has been presented regarding his claim.

2. At oral argument, plaintiffs stated that they did not challenge the findings of the respective ALJs in the context of this motion. (Tr. at 4.) Nevertheless, the facts they presented in

## I. *Rashid Ahmed*

On December 2, 1999, Ahmed asked a prospective fare where he was going, even though he had already illuminated his "off duty" light. The passenger told Ahmed his destination, and Ahmed refused to take him. The passenger, a New York· City police officer who was working undercover as part of Operation Refusal, issued Ahmed two summonses for violations of § 2–50(b) (service refusal) and § 2–61(a)(2) (acting against the best interest of the public). He summarily suspended Ahmed's license and confiscated his taxicab. Several days later, Ahmed had a "summary suspension hearing" during which, he alleges, he was not permitted to present any evidence, and where his suspension was upheld.

Almost three months later, Ahmed had a revocation hearing on the merits on February 24, 2000, before OATH ALJ McFaul. ALJ McFaul found that Ahmed had refused service for economic reasons, and recommended a fine of $300.00 pursuant to § 2–87(a)(1), the mandatory penalty for a first violation of § 2–50(b). McGrath–McKechnie has not yet rendered a final decision on Ahmed's case. Ahmed claims that his suspension has continued for seven months, while TLC contends that his suspension was lifted sixty days after the revocation hearing, pursuant to § 8–16(f). Ahmed's license to operate taxicabs expired on May 31, 2000.

## II. *John Padberg*

On February 15, 2000, TLC agents Alston ("Alston"), who is African–American, and Bonilla ("Bonilla"), who is Caucasian, conducted a sting operation as part of Operation Refusal. Alston and Bonilla positioned themselves on consecutive blocks,

their papers were not consistent with those found by the ALJs. However, given the nature of plaintiffs' claims and the decision of this Court, the discrepancies are irrelevant for present purposes, and therefore the Court will set out the facts only as found by the ALJs.

with Bonilla a block behind Alston. As Padberg approached, Alston, and immediately thereafter Bonilla, attempted to hail him. Padberg stopped for Bonilla, whereupon Alston issued Padberg two summonses for violations of 2–50(b) and 2–61(a)(2), summarily suspended his license and confiscated his car. At Padberg's "summary suspension hearing" on February 18, 2000, TLC ALJ Schwartz found that sufficient allegations of service refusal, combined with a prior record of violations, warranted the continuation of the suspension.

A revocation hearing was held before TLC ALJ Elliott on March 6, 2000. ALJ Elliott found that Padberg had refused service in violation of § 2–50(b). Pursuant to TLC policy, Elliott found that the service refusal also constituted an act against the best interest of the public, in violation of § 2–61(a)(2). Elliott therefore recommended revocation. In response to this recommendation, Padberg submitted a letter and character references to TLC on March 31, 2000. After reviewing Padberg's submissions, McGrath–McKechnie adopted the ALJ's recommendation on May 9, 2000, revoking Padberg's license. Padberg did not administratively appeal this ruling, and his time to do so expired on June 9, 2000.

## DISCUSSION

Plaintiffs contend that TLC policies of summary suspension and license revocation for a first offense of service refusal run afoul of 42 U.S.C. § 1983 by depriving them of property rights without due process. Plaintiffs further contend that the loss of their taxicab drivers' licenses works an irreparable injury upon them, and that they are therefore entitled to a preliminary injunction. TLC, however, maintains that plaintiffs have shown neither irreparable harm nor a likelihood of success on the merits of their claim, and that their motion for preliminary injunctive relief must consequently be denied.

It should be noted at the outset that neither Paolillo nor Ahmed is eligible for preliminary relief. As stated earlier, plaintiffs submit no information regarding Paolillo, and as such, the Court will not consider his motion at this time. Since Ahmed's taxicab driver's license has expired, he, too, cannot currently benefit from a preliminary injunction. Although Ahmed might conceivably reapply for a license, the record does not indicate that he has done so. Therefore, considering his motion now would be premature, and so, the remainder of this opinion will deal only with Padberg's claim.

### I. Requirements For A Preliminary Injunction

■ The standards for obtaining a preliminary injunction are well established: a party must show (1) irreparable harm, and (2) either a likelihood of success on the merits of his claims, or else, sufficiently serious questions going to the merits to make them fair grounds for litigation, with the balance of hardships tipped in his favor. See, e.g., Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996).

### A. Irreparable Harm

■ As an initial requirement for a preliminary injunction, a party must establish that, absent the injunction, he will suffer irreparable harm. See id. An irreparable harm is non-speculative, and cannot adequately be compensated through monetary damages. See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37 (2d Cir.1995). Generally, the Second Circuit has recognized any loss that threatens the continuing viability of a party's business as an irreparable harm. See id. at 37, 38.

Padberg contends that suspension and revocation of his license constitute irreparable harm, because without the license, he cannot operate his business or earn a living. TLC argues that Padberg will not suffer irreparable harm should an injunction not issue because he failed to administratively appeal his revocation.

TLC's argument, however, does not squarely address the issue of irreparable harm. Without doubt, depriving a taxicab driver of his license deprives him of his livelihood. And at this stage of these proceedings, the record before this Court does not indicate that Padberg has found gainful employment in another line of work. Thus the deprivation of his license imminently threatens his continued subsistence, an injury which is clearly non-speculative, and which could not be adequately compensated by a monetary award sometime in the distant future. Padberg's failure to exhaust his administrative remedies has no bearing on the harm he suffers as a result of being unable to operate his taxicab. While this fact might have more relevance to an argument—which TLC does not make—that this Court lacks subject-matter jurisdiction over Padberg's claim, it would not be dispositive in that context either, for in general, a litigant need not exhaust his administrative remedies before bringing a § 1983 action in federal court. *See Patsy v. Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

### B. Showing On The Merits

Yet even in the face of undoubted irreparable harm, the Court will not issue a preliminary injunction unless Padberg makes some showing on the merits of his case. Generally, the party seeking preliminary relief will satisfy his burden if he shows either a likelihood of success on the merits, or alternatively, sufficiently serious questions going to the merits of his claims to make them fair ground for litigation, together with a balance of hardships tipping in his favor. *See, e.g., Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989). But where a party "seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," he must meet the more rigorous of the two standards. *See id.* TLC, an organ of the city government, has been summarily suspending and revoking licenses pursuant to authority claimed under Title 35 of the Rules of the City of New York ("Title 35"), and Title 19 of the New York City Administrative Code ("Title 19"). Additionally, as the parties have acknowledged, ending racially-motivated service refusals would surely benefit the public interest. As such, Operation Refusal constitutes governmental action taken in the public interest pursuant to a regulatory scheme, and so, Padberg must prove, at the least, that his § 1983 claims will likely succeed before he can obtain an injunction.

The determination that Padberg's proposed injunction would stay governmental action does not end the inquiry, however. Padberg may have to meet an even more rigid standard than "likelihood of success," since the injunction he seeks would direct TLC to reinstate his license, effecting a change in the relative positions of the parties as they now stand. In two situations, a party seeking an injunction must show a *clear* or *substantial* likelihood of success on the merits of his claims. The first is when he seeks a "mandatory" injunction, that is, an injunction that changes the status quo; and the second is when he seeks an injunction that will provide him with substantially all the relief he requests, and which cannot be undone even if his adversary subsequently wins at trial. *See Tom Doherty Assocs.,* 60 F.3d at 33–34. As Padberg will presumably ask for monetary damages to compensate him for the work he has already missed as a result of losing his license, an injunction will not provide him with substantially all the relief he seeks. Likewise, even if this Court orders TLC to reinstate Padberg's license, nothing prevents TLC from revoking it again in the wake of a victory at trial.

Nevertheless, Padberg's proposed injunction might still be considered "mandatory" since it would direct TLC to restore his license, in contrast with a standard "prohibitory" injunction which merely forbids a party from taking a certain action. However, as *Abdul Wali v. Coughlin,* 754

F.2d 1015 (2d Cir.1985), makes clear, the status quo is a relative concept, and varies with the perspective from which it is viewed. *See id.* at 1025–26 (holding that an injunction directing the defendant to permit the delivery of a report to inmates in Attica was prohibitory in nature, even though the defendant had already prevented the report's delivery, and as such, the injunction changed the apparent status quo). Therefore, an injunction which orders a party to perform an action it should previously have performed may be characterized as prohibitory, since it does not change the status quo as it would have existed, absent that party's wrongful action. As the Second Circuit held in *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988), an injunction directing a union to pay for its president to mail information concerning an upcoming referendum was non-mandatory, even though it forced the union to spend funds it could otherwise have saved, since "it only required the union to do what it should have done earlier—open channels of communication to dissenting views ..." Similarly, in the case at bar, Padberg contends that TLC acted unlawfully in revoking his license. If so, then a preliminary injunction ordering his reinstatement would merely require TLC to do something it should have done earlier, or more precisely, to undo what it should not have done.

■ While at first blush, *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir.1996), might indicate that the injunction in question is mandatory after all, that case can be distinguished from the present one. In *Jolly*, a prisoner who was not permitted to leave his cell because he had refused a tuberculosis test for religious reasons sought a preliminary injunction releasing him from "medical keeplock" pending a trial on the merits of his claim. The Second Circuit held that the injunction was mandatory in nature, even though it could be viewed as prohibiting the defendants from continuing to confine the plaintiff in his cell. *See id.* at 474. That court was moved by the fact

that the tuberculosis testing program which the plaintiff resisted had been in effect for four years, and that for three and a half of them, the plaintiff had been in keeplock. *See id.* In contrast, the TLC policies complained of in this case have only been in effect since November 1999— for less than one year; likewise, TLC revoked Padberg's license in May 2000, less than three months ago. Given that without TLC action, Padberg would still have his license, and given that he was deprived of his license only recently, the relevant status quo here is the one that existed before the revocation. Therefore, the injunction which Padberg seeks is prohibitory, and is subject, as such, to the less stringent "likelihood of success" standard.

## II. § 1983 Claims

■ To succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that the defendant deprived him of a right protected by the Constitution or laws of the United States; and (2) that the defendant acted "under color of law." *See* 42 U.S.C. § 1983 (1994) (amended 1996); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Since TLC claims it revoked Padberg's license pursuant to Title 35 and Title 19, Padberg will clearly succeed in proving that TLC acted "under color of law." The only question is whether TLC deprived Padberg of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

■ At the outset, Padberg correctly asserts, and TLC does not dispute, that a taxicab driver's license is a property interest subject to the due process protections of the Fourteenth Amendment. In *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the Supreme Court accorded due process protection to a state driver's license, observing that "[o]nce licenses are issued ... their continued possession may become essential in the pursuit of a livelihood." This reasoning applies even more forcefully to a taxi-

cab driver's license, since such a license cannot be distinguished from the business for which it is a necessary prerequisite. Not only is the license valuable, though, but it is also exclusive, for only Padberg may use it to operate his taxicab. Traditionally, exclusivity has been the hallmark of a property interest. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Furthermore, in the course of driving his taxicab, Padberg has mixed his labor with the license; if that license could now be revoked without any procedural protections, then Padberg, together with all the other taxicab drivers on whom this city depends, would have less incentive to continue providing their valuable services.

Simply because the license is subject to constitutional protections, however, does not mean that any revocation of it will violate Padberg's Fourteenth Amendment rights. In this regard, Padberg advances three principal contentions: first, that the Rules of the City of New York do not authorize TLC to revoke his license for a first or second offense of service refusal, and as such, the revocation was illegal; second, that a biased TLC ALJ denied him a fair hearing; and third, that TLC summarily suspended his license without notice or an opportunity to be heard. TLC challenges Padberg's assertions, maintaining that the penalty of revocation for first-time offenders is authorized by the Rules, that there has been no showing of ALJ bias and that Padberg's "summary suspension hearing" provided him with adequate process to satisfy the Fourteenth Amendment's requirements.

A. Unauthorized Revocation

There is little doubt that Padberg has met the first requirement of a § 1983 claim, for if TLC had revoked his license without the requisite authority, then it would indeed have deprived him of a right secured by the Constitution. In *Salahuddin v. Coughlin*, 781 F.2d 24, 27 n. 4 (2d Cir.1986), the Second Circuit stated that "the infliction of punishment when not authorized by state law is a classic instance of denial of liberty without due process of law." In that case, prison officials returned the plaintiff to solitary confinement after a court had granted his habeas corpus petition challenging that punishment. By analogy, a revocation of Padberg's license not authorized by Title 35 or Title 19 would deprive him of his property without due process.

■ However, Padberg's arguments have not convinced this Court that TLC lacks the authority to revoke a taxicab driver's license for a first or second offense of service refusal. Padberg contends that the mandatory penalties for service refusal set forth in § 2–87(a)(1) are exclusive. But that section states explicitly that it does not "limit or restrict any other authority the Commission may have to suspend or revoke a driver's license," 35 RCNY § 2–87(a)(1); thus, even on its face, the mandatory penalties which § 2–87 authorizes are non-exclusive. Moreover, as is clear from § 2–88 and former § 2–85, Title 35's regulatory scheme specifically contemplates discretionary license revocation as a penalty for a service refusal. *See* 35 RCNY § 2–88 (authorizing revocation and suspension for violations of § 2–50 "in excess of those set forth in the above rules 2–86 and 2–87 ..."); 35 RCNY § 2–95 (repealed 1999) (authorizing revocation for violations of § 2–50 in addition to mandatory penalties whenever TLC determines it is warranted). And after the 2000 Amendments were adopted, TLC gained the further authority to revoke or suspend licenses "[i]n the alternative to *any specific penalties* set forth in the Commission Rules ..." 35 RCNY § 8–03(b) (emphasis added). In light of these provisions, Padberg has clearly failed to establish a "likelihood of success" with respect to his argument that TLC may only revoke a taxicab driver's license for a third service refusal.

■ Padberg's other contention in this regard also fails to persuade the Court.

Padberg states correctly that under traditional principles of statutory construction, where two provisions purporting to cover the same matter are contradictory, the more specific will supplant the more general. He then claims that this principle requires the more specific § 2–50(b) to displace the more general § 2–61(a)(2) concerning the penalty for service refusals. However, "the mere existence of a specific statute carrying a lighter penalty" does not by itself undermine the applicability of a more general rule, "unless they cannot coexist independently." *United States v. Bennerson,* 616 F.Supp. 167, 174–5 (S.D.N.Y.1985) (holding that a more specific statute prohibiting the concealment of stolen government checks did not partially repeal a more general statute forbidding the concealment of government property, and that the government could proceed against the defendant under either). Here, the penalty of discretionary revocation for a violation of § 2–61(a)(2) does not conflict with the penalty scheme of § 2–50(b), for as discussed above, the latter rule expressly provides that it does not limit TLC's considerable authority to impose discretionary revocation as a penalty for any violation. As such, §§ 2–50(b) and 2–61(a)(2) do not contradict each other, making the principle of construction which Padberg invokes inapposite.

Furthermore, Padberg ignores another principle of statutory construction: insofar as possible, statutes which cover the same matter should be construed together. *See Lower Manhattan Loft Tenants v. New York City Loft Bd.,* 66 N.Y.2d 298, 496 N.Y.S.2d 979, 487 N.E.2d 889, 892 (1985). In this case, § 2–61(a)(2) arguably applies to service refusals; indeed, at oral argument, Padberg's counsel conceded that a racially-motivated service refusal implicates the "public welfare." (Tr. 10.) Since § 2–50(b) and § 2–61(a)(2) do not conflict, there appears to be no reason why TLC should not be permitted to penalize drivers who are found to have refused service under either rule. Therefore, Padberg's claim that TLC has acted unlawfully in

revoking his license pursuant to § 2–61(a)(2) also fails to meet the "likelihood of success" standard.

B. Fair Hearing

■ Padberg is mistaken to suggest that his hearing before a TLC ALJ denied him due process. Padberg essentially claims that since TLC sought to revoke his license, ALJ Elliott, employed by TLC, could not have given him an unbiased hearing. But this issue was addressed in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), in which the Supreme Court held that the same board of medical examiners could both investigate and punish a doctor charged with violations of its rules. Central to the holding in *Withrow* was the presumption that those who serve as adjudicators are possessed of honesty and integrity. *See id.* at 47, 95 S.Ct. 1456. Padberg has provided no information to undermine this presumption with respect to ALJ Elliott, and as such, he has not established a likelihood of success with respect to this claim.

C. Summary Suspension

■ Padberg contends that summary suspension of his license deprived him of property without due process of law. TLC claims that the "summary suspension hearing" provided adequate process. This Court disagrees.

■ As a general rule, due process requires that an individual be given notice and an opportunity to be heard before he may be deprived of his property. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 48, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that the ex parte seizure of the plaintiff's home pursuant to a civil forfeiture statute providing no pre-seizure notice or opportunity to be heard violated the plaintiff's Fifth Amendment due process rights). However, exceptions to this rule do exist in the presence of "exigent" or "extraordinary" circumstances. *See id.* at 53, 114 S.Ct.

492. The analysis set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), has long guided courts in their efforts to define appropriate due process protections, by requiring them to balance three factors: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of that interest in light of the procedures used, and the likely value of alternative procedural protections; and (3) the government's interest, including the administrative burden that additional procedural safeguards would impose. *See id.* at 335, 96 S.Ct. 893; *James Daniel Good,* 510 U.S. at 48, 114 S.Ct. 492.

Under the first *Mathews* factor, Padberg's affected interest is significant indeed. His taxicab driver's license is nothing short of his livelihood. Summary suspension works a deep invasion of his property, for it prevents him from earning a living. The Second Circuit has acknowledged that the continuation of a business is a fundamental interest subject to staunch due process safeguards. *See United States v. All Assets of Statewide Auto Parts,* 971 F.2d 896, 902, 905 (2d Cir.1992) (holding that the ex parte seizure and shut down of the defendant's business pursuant to civil forfeiture proceedings without pre-seizure notice and opportunity to be heard violated the defendant's due process rights).

Although the summary suspension is by nature temporary pending a full hearing on the merits, its impermanent nature, particularly under the circumstances now presented, does not significantly diminish the magnitude of the intrusion into Padberg's property interests. While it is true that the duration of a deprivation must always be considered, *see Mackey v. Montrym,* 443 U.S. 1, 12, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979), it is also true that even temporary deprivations can cause great injuries, and as such, will generally be subject to the due process requirements of pre-seizure notice and opportunity to be heard, *see Fuentes v. Shevin,* 407 U.S. 67, 84–85, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *see also, Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (holding that when an uninsured driver was involved in an accident, suspension pending trial of his license without a pre-seizure hearing on the issue of liability violated his due process rights).

Traditionally, those cases in which courts have not required a pre-seizure have dealt with deprivations of brief, or at least limited durations. *See Mackey,* 443 U.S. at 12, 99 S.Ct. 2612 (suspension limited by statute to 90 days); *Barry v. Barchi,* 443 U.S. 55, 59, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (fifteen-day suspension). *But see Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (holding that exigent circumstances permitted the permanent governmental seizure of a yacht used in drug trafficking without a pre-seizure hearing); *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577 (2d Cir.1989) (holding that exigent circumstances permitted termination of a medical lab from the Medicaid program, when the lab had been illegally dumping hazardous waste). In contrast no limit seems to have been placed on Padberg's suspension. While § 8–16(f) does require the TLC Chairperson to uphold or reverse a driver's suspension within sixty days of his "summary suspension hearing," once the Chairperson has decided to affirm a suspension, it seemingly can continue indefinitely. The Court is not aware of any regulatory provision limiting the time period for TLC to schedule a final revocation hearing following the affirmation.

The second *Mathews* factor, the risk of erroneous deprivation, also weighs in Padberg's favor. The TLC suspended Padberg's license based solely on the allegations of its inspectors. No neutral adjudicator was consulted, nor did Padberg have any meaningful opportunity to give his version of events. While the *Mackey* court held the sworn and corroborated af-

fidavit of a police officer to be sufficient grounds for suspending the license of a suspected drunk driver who refused to take a breathalyzer test, *see* 443 U.S. at 14, 99 S.Ct. 2612, that case is distinguishable from the one at bar. First, the statute which authorized summary suspension in Mackey required the police officer who witnessed the refusal to swear to the truth of his report, subjecting himself to possible civil and criminal liability. *See id.* Title 35 does not require any such sworn statement from TLC inspectors before they may summarily-suspend a taxicab driver's license. Second, the defendant in *Mackey* had been arrested with probable cause for driving while under the influence of an intoxicant. While alcohol can be detected on a person's breath, and may have noticeable effects on his behavior, racial bias leaves no telltale signs. By this, the Court does not mean to suggest any dishonesty on the parts of inspectors Alston and Bonilla; indeed, an ALJ ultimately found their testimony credible at Padberg's revocation hearing. However, the inevitably subjective nature of the inquiry and the compelling objective of the investigative mission provides a formula for mistake and counsels caution. Whether a taxicab driver has failed to respond to hail for racially-motivated reasons, or simply because he did not see it, will rarely be ascertainable in the absence of an impartial hearing.

A second problem with TLC procedures is the nature of the "summary suspension hearing." Prompt, post-deprivation hearings have, on occasion, sufficed for due process purposes. However, such post-seizure adjudications have been on the merits, and they have speedily followed the deprivations. For example, the Supreme Court in *Mackey* did not require a pre-seizure hearing, largely because a post-seizure review on the merits was available as early as the day following the suspension. *See id.* at 12, 13, 99 S.Ct. 2612. And in *Barry*, 443 U.S. at 66, 99 S.Ct. 2642, although the court did not re-

quire a hearing before the defendant suspended the plaintiff's horse trainer's license when his horse had tested positive for drugs, it nonetheless held the statute authorizing the suspension unconstitutional because it did not provide the trainer with a prompt, post-seizure hearing to fully and finally determine his liability. Section 8-16(b) does provide for a full and final hearing on the merits within five days of suspension. *See* 35 RCNY § 8-16(b). However, Padberg's "summary suspension hearing," pursuant to §§ 8-16(c) and (d), consisted merely of an ALJ verifying that his summonses were properly filled out, and examining his record for past violations. Padberg had to wait almost three weeks before he received a substantive hearing on the issue of whether he had actually refused service.

The highly subjective factual disputes which necessarily attend most determinations of service refusal, combined with the inadequacy of TLC's post-deprivation procedures, would have recommended the institution of additional pre-seizure safeguards in Padberg's case. Unlike *Mackey* or *Dixon v. Love,* 431 U.S. 105, 113–114, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (holding that a pre-seizure hearing would not have reduced the risk of erroneous deprivation since the discretionary revocation of the plaintiff's truck driver's license was based on three prior convictions of speeding within a four-year period, and the plaintiff could not challenge the validity of the convictions), a pre-seizure hearing might well have reduced the risk that Padberg's license would be erroneously suspended. Indeed, where deprivation has turned on the credibility of opposing testimony and on the strength of inferences drawn regarding a person's state of mind, courts have been far more likely to impose some type of pre-seizure protections, even where the untested evidence on its face appeared to justify the seizure. *See James Daniel Good,* 510 U.S. at 56, 114 S.Ct. 492, (holding that before seizing the plaintiff's house pursuant to a civil forfeiture statute autho-

rizing seizure of property used in drug crimes, the government had to afford the plaintiff an opportunity to prove he was an innocent owner or that there was no probable cause for the seizure, even though he had already pled guilty to violating state drug laws). Padberg's revocation was ultimately based on an ALJ's decision to credit the testimony of TLC inspectors over Padberg's. But had the ALJ decided the opposite way, Padberg would have been needlessly deprived of his livelihood for three weeks.

Like the other two *Mathews* factors, the third—the government's interest, together with the administrative burden of additional procedural safeguards—also contributes to this Court's view that Padberg was entitled to pre-seizure notice and an opportunity to be heard. This does not belittle or contradict TLC's compelling interest in eradicating racial bias from its fleet of licensed taxicab drivers. Indeed, the evidence that some members of racial minorities, particularly African–American males, have difficulty in hailing taxicabs calls for an aggressive response, albeit one that is constitutionally sound. Nevertheless, an assessment of TLC's interest in the use of summary suspensions to carry out its goal of ending racially-motivated service refusals leads to the conclusion that no "exigent" or "extraordinary" circumstances exist in this case to warrant relaxing due process protections.

██ Exigent circumstances exist when three requirements are met: (1) the seizure is carried out by a government official, pursuant to a narrowly-drawn statute; (2) it is necessary to secure an important public or governmental interest; and (3) there is a need for "prompt action." *See Statewide Auto Parts,* 971 F.2d at 903 (citing *Fuentes,* 407 U.S. at 91–92, 92 S.Ct. 1983).

While this Court perceives the urgent need to remove racially-biased taxicab drivers from the street, it nevertheless finds that TLC has not demonstrated a need for "prompt action" as that phrase has been defined in the context of due process jurisprudence. Prompt action has been necessary where the government sought to seize highly mobile property; in *Calero–Toledo,* immediate seizure of a yacht was required to prevent it from sailing away. *See James Daniel Good,* 510 U.S. at 57, 114 S.Ct. 492 (construing *Calero–Toledo,* 416 U.S. at 679, 94 S.Ct. 2080). In contrast, Padberg's license was unlikely to disappear. Like the house in *James Daniel Good,* it was not the kind of property that could abscond.

Prompt action has also been required to protect public health. In *Mackey,* 443 U.S. at 18, 99 S.Ct. 2612, a failure to summarily suspend probable drunk drivers who refused to take breathalyzer tests would have endangered the public, undermined the state's efforts to prosecute offenders and remove them from the road. Public welfare, too, has created a need for prompt action. In *Barry,* 443 U.S. at 64–65, 99 S.Ct. 2642, in the face of objective evidence that a horse had been drugged, the state quickly suspended the suspected trainer in order to preserve "the integrity of the racing carried on under its auspices," and to "protect[ ] the public from harm . . ." While the *Barry* court does not delve into the dangers that might have otherwise resulted from state inaction, it is clear, at least, that those who had already bet on the horse would suffer a virtually non-remediable financial loss. Additionally, had it permitted the trainer to continue working, the state ran the risk that he might drug another horse. This might further have served to undermine confidence in the horse racing industry, resulting in a concomitant loss of substantial state racing revenues.

As odious as they are, service refusals on racial grounds do not jeopardize life or public safety, or present the compelling circumstances present in *Mackey* or *Barry.* Rather, they are acts against the public welfare. This Court has found only one case arguably concerning an affront to the public welfare where prompt action was

thought to be required. In *Plaza Health,* the state suspended Medicaid payments to a laboratory that had been indicted for illegally dumping medical waste. *Plaza Health,* however, may be distinguished from the present case in a number of ways. First, the Second Circuit was not certain that a property interest was even implicated by the suspension of the lab from the Medicaid program, *see* 878 F.2d at 581; by contrast, as shown above, a taxicab driver's license is undoubtedly property. Second, beyond any negative impact on public welfare caused by continued state patronage of a laboratory which had violated the law, the laboratory's action—dumping hazardous medical waste—additionally implicated the state's duty to protect public health. While acts against the public welfare are certainly bad in themselves, service refusals do not implicate the additional governmental responsibilities of protecting public health or safety. Finally, in deciding *Plaza Health,* the Second Circuit felt constrained by the *Barry* decision. *See id.* at 583. But *Barry* has already been distinguished from the case at bar in many respects, so that its influence here is somewhat less than controlling.

TLC nevertheless contends that summary suspension is necessary to deter other drivers who might refuse service. While the *Mackey* decision rested partially on this rationale, *see* 443 U.S. at 18, 99 S.Ct. 2612, given the many other differences between the present case and *Mackey,* the deterrent effect, standing alone, is not sufficient to warrant the abrogation of standard due process procedures.

Furthermore, the administrative burden that a pre-suspension hearing would impose on TLC is slight at most, and perhaps non-existent. TLC rules already provide for a full and final revocation hearing on the merits within five days of the suspension, so long as a taxicab driver does not elect to have a "summary suspension hearing." *See* 35 RCNY §§ 8–16(b)—(d). Requiring TLC to provide the revocation hearing five days earlier, before taking away a driver's license, would result in no apparent additional cost. In fact, a pre-seizure hearing on the merits might well save TLC administrative costs. A hearing which fully and finally adjudicated all the issues prior to any deprivation would entirely obviate the need for a "summary suspension hearing." Drivers would then get only one hearing, while now they are having two.

For all of the above reasons, this Court finds that Padberg has indeed shown a likelihood of success on his § 1983 claim of deprivation of property without due process. In spite of this showing, however, he is still not entitled to a preliminary injunction. As the Second Circuit stated in *Statewide Auto Parts,* 971 F.2d at 905, "[d]ue process requires notice and the opportunity to be heard at a meaningful time." Like the plaintiff in *Statewide,* Padberg has, at this point, had ample opportunity to be heard: he has had a full and fair revocation hearing on the merits, and he has had the opportunity, of which he did not avail himself, to appeal the ALJ's recommended penalty. Thus, while Padberg may ultimately prevail on his due process claim, he is not a candidate for preliminary injunctive relief.

### CONCLUSION

For the foregoing reasons, this Court denies plaintiffs' motion for a temporary restraining order and preliminary injunction.

SO ORDERED.