John PADBERG, Clifford Paolillo and Rashid Ahmed, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Diane MCGRATH–MCKECHNIE, Rudolph W. Giuliani, Joseph Mckay, Matthew Daus, Harry Rubinstein, Elliot Sander, Harvey Giannoulis, Marvin Greenberg, Ramona Whaley and the New York City Taxi and Limousine Commission, Defendants.

Abid Baig, Mohammed Khan, Khalid Mahmood, Mulugheta Sultan, and the New York Taxi Workers Alliance, Plaintiffs,

v.

Rudolph W. Giuliani, Mayor of the City of New York, New York City Taxi and Limousine Commission, and Diane Mcgrath–Mckechnie, Commissioner/Chairperson of the Taxi and Limousine Commission, Defendants.

No. 00–CV–3355.

United States District Court, E.D. New York.

April 29, 2002.

Daniel L. Ackman, Brad E. Mazarin, Block & Mazarin, New York City, for Padberg plaintiffs.

Chaumtoli Huq, Kenneth Kimerling, Asian American Legal Defense and Education Fund, New York City, for Baig plaintiffs.

Jerald Horowitz, Michael D. Hess, Gabriel Taussig, Deborah Rand, Corporation Counsel of the City of New York, New York City, for defendants.

## MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiffs in the above-captioned cases commenced these actions pursuant to 42 U.S.C. § 1983 to challenge "Operation Refusal," an initiative started in 1999 by the New York City Taxi and Limousine Commission ("TLC" or "Commission"), former Mayor Rudolph Giuliani and Diane McGrath–McKechnie, the Chairperson of the TLC, to increase disciplinary action against taxicab drivers who refuse service

on impermissible grounds. Specifically, plaintiffs challenge two policies of Operation Refusal claiming they violated their due process rights under the Fourteenth Amendment. The first practice is the summary suspension of taxicab licenses upon a charge of an unjustified service refusal. The second practice is the suspension or revocation of taxicab licenses, after a hearing, for first and second service refusal offenses. The individual plaintiffs in *Padberg v. McGrath–McKechnie* ("*Padberg* plaintiffs") and *Baig v. Guiliani* ("*Baig* plaintiffs") are taxicab drivers whose licenses were summarily suspended pursuant to the first practice and who faced suspension or revocation of their licenses pursuant to the second policy. The *Baig* plaintiffs also include the New York Taxi Workers Alliance ("NYTWA"), a membership organization devoted to preserving the rights of taxi drivers and improving working conditions for taxi drivers in New York City.

This Court previously denied the *Padberg* plaintiffs' motion for a preliminary injunction when they sought to enjoin the TLC from suspending or revoking licenses pursuant to the challenged practices, and to have the TLC return those licenses already suspended or revoked pursuant to the challenged practices. *See Padberg v. McGrath–McKechnie*, 108 F.Supp.2d 177, 190 (E.D.N.Y.2000). The *Baig* plaintiffs subsequently commenced a separate § 1983 suit to challenge the very same conduct, asking the Court for a preliminary injunction enjoining the challenged TLC practices and seeking the return of licenses suspended or revoked pursuant to those policies. The *Padberg* plaintiffs then moved for summary judgment. The *Baig* plaintiffs joined that motion. Presently before the Court are the *Padberg* and *Baig* plaintiffs' joint motion for summary judgment, defendants' cross-motion for summary judgment and the *Baig* plaintiffs'

motion for a preliminary injunction. For the following reasons, plaintiffs' motion for summary judgment is granted in part and denied in part, defendants' cross-motion for summary judgment is granted in part and denied in part and the *Baig* plaintiffs' motion for a preliminary injunction is granted in part and denied in part.

## BACKGROUND

This case focuses on the fallout from Operation Refusal—a widely publicized TLC initiative to combat racial bias among taxicab drivers in New York City. Since the inception of Operation Refusal in November 1999, the TLC has summarily suspended and revoked the licenses of several taxicab drivers accused of refusing service. All individual plaintiffs are taxicab drivers who have been disciplined under the policies of Operation Refusal, which they now challenge on several grounds.

### A. Statutory and Regulatory Framework

The TLC possesses the authority to promulgate rules and regulations and to set standards of conduct within the taxi and limousine industry. New York City, N.Y., Charter ch. 65, § 2300 (1971) ("N.Y.C. Charter § ____"). The TLC is comprised of nine members, one of whom is appointed by the Mayor to act as chairperson. N.Y.C. Charter § 2301(a) & (c). The purpose of the TLC is to develop and improve taxi and limousine service by adopting and establishing overall policy, and by establishing criteria and standards for driver safety, service, equipment safety and design, and conduct. N.Y.C. Charter § 2300. The Commission has the power and duty to regulate and supervise the vehicle for hire industry, including the issuance, revocation, and suspension of licenses of drivers, in order to ensure that the established standards and rules of conduct and service

are followed. N.Y.C. Charter § 2303(b)(5). Exercising this authority, the TLC promulgates Taxi and Limousine Commission Rules ("TLC Rules"). N.Y.C. Charter § 2303(b)(11) to further these purposes. At issue in this case are, *inter alia,* TLC Rules specifying prohibited conduct for taxicab drivers, *see, e.g.,* New York City, N.Y., Rules tit. 35, § 2–50 ("35 RCNY § ____") (prohibiting unjustified service refusals and specifying what constitutes a justified service refusal), the penalties drivers face for violations of such conduct rules, *see, e.g.,* 35 RCNY § 2–87 (specifying certain mandatory penalties for unjustified service refusals), and the procedures used to prosecute these offenders, *see, e.g.,* 35 RCNY § 8–16 (outlining procedures for summary suspension of a driver's license).

## B. Prohibited Conduct and Penalties

Both the Administrative Code of the City of New York ("Administrative Code" or "Code") and the TLC Rules prohibit unjustified service refusals. New York City, N.Y., Admin.Code § 19–507(a) (1989) ("Admin. Code § ____"); 35 RCNY § 2–50. Service refusals refer to those instances where, by words or actions, drivers refuse service to a potential passenger. The prohibition on service refusals found in the Administrative Code does not define an "unjustified" service refusal, but § 2–50(e) of the TLC Rules fills this gap by providing eleven justifications for a service refusal.[1]

1. The eleven justifications for a service refusal include:

(1) another passenger is already seated in the taxicab; (2) a hail from another person has already been acknowledged by the driver, and that other person is being picked up or is about to be picked up. Provided, however, that a driver shall not acknowledge the hail of a prospective passenger over the hail of another prospective passenger with an intent to avoid transporting the passenger whose hail was not acknowledged; (3) the passenger is carrying, or is in possession of any article, package, case or container other than a wheelchair or other mobility aid, which the driver may reasonably believe will cause damage to the interior of the taxicab, impair its efficient operation, or cause it to become stained or foul smelling; (4) the driver is ending his workshift and has already illuminated the "Off duty" sign, locked both rear doors, and has indicated on the trip record that he is off duty and proceeding to his garage or home; (5) it is necessary to take the taxicab out of service for one of the reasons given in § 2–52(a) hereof, and the driver has already illuminated the "Off Duty" sign, made the appropriate trip record entry, and locked both rear doors; (6) the driver is discharging his last passenger or passenger prior to going off duty, and has already illuminated his "Off Duty" sign and made the appropriate trip record entry; (7) the passenger is escorting or accompanied by an animal which is not properly or adequately secured in a kennel case or other suitable container. This provision shall not apply to service animals accompanying people with disabilities; (8) the destination is within the counties of Nassau or Westchester, or Newark Airport, and the driver has been operating the taxicab for more than eight (8) hours of any continuous twenty-four (24) hour period; (9) the passenger is disorderly or intoxicated. Provided, however, that a driver shall not refuse to provide service to a person with a disability solely because such person's disability results in an appearance or involuntary behavior which may offend, annoy, or inconvenience the driver; (10) a driver has a position on the "long haul" line at an airport taxi stand and the passenger desires "short haul" transportation and there is another taxicab available on the "short haul" line; or the driver has a position on the "short haul" line and the passenger desires "long haul" transportation and there is another taxicab available on the "long haul" line; or (11) if the passenger has refused a request by the driver to obey the no-smoking requirement of law; the driver may discharge the passenger after asking the passenger to cease smoking in the taxicab, but if he does discharge the passenger it must be at a safe location. 35 RCNY § 2–50(e).

Both the Administrative Code and the TLC Rules provide "mandatory penalties" for service refusals. Admin.Code § 19–507; 35 RCNY § 2–87. Section 19–507(a) states that the TLC "shall fine any driver or suspend or revoke the driver's license of any driver, as provided in subdivision b of this section, who shall have been found in violation of [the prohibition against unjustified service refusals]." Admin.Code § 19–507(a). Section 19–507(b) specifies the penalties for one or more service refusals. Admin.Code § 19–507(b). For a first service refusal offense, a driver "shall be fined not less than two hundred dollars nor more than three hundred fifty dollars." *Id.* For a second offense within a twenty-four month period the driver "shall be fined not less than three hundred fifty dollars nor more than five hundred dollars, and the commission may suspend the driver's license of such driver for a period not to exceed thirty days." *Id.* Finally, for a third offense within a thirty-six month period, "the commission shall revoke the driver's license." *Id.*

Section 2–87 of the TLC Rules specifies the same penalties as § 19–507 of the Administrative Code. *See* 35 RCNY § 2–87(a)(1). Unlike § 19–507, however, § 2–87 states that "[n]othing contained herein shall limit or restrict any other authority the Commission may have to suspend or revoke a driver's license." *Id.* Similarly, § 2–88 of the TLC Rules states that, "[v]iolation of any of these rules [including § 2–50(b) regarding service refusals] may also lead to revocation or suspension of a taxicab driver's license and/or fines in excess of those set forth in the above §§ 2–86 and 2–87." 35 RCNY § 2–88. Section 19–507 of the Administrative Code does not contain any reference to a general authority given to the TLC to suspend or revoke driver's licenses. Nevertheless, in the same year that § 19–507 was enacted, the City Council also enacted § 19–505(1),

which provides that "[t]he Commission may, after a hearing, suspend or revoke any driver's license ... for failure to comply with the commission's rules and regulations." Admin.Code § 19–505(1).

## C. Operation Refusal

In November 1999, at the direction of Mayor Giuliani and Chairperson McGrath–McKechnie, the TLC instituted a heightened enforcement campaign targeting the long-standing problem of unjustified service refusals. This new policy, referred to as "Operation Refusal," followed the highly publicized service refusal complaint filed by the actor Danny Glover. Operation Refusal involved the adoption of two new policies. First, TLC Officers were required to summarily suspend the license of a driver charged with an unjustified service refusal ("summary suspension policy"). Second, due to the classification of service refusals as conduct against the public interest, drivers were subject to the penalties of suspension or revocation for first and second service refusal offenses ("suspension and revocation policy").

Operation Refusal grew out of a number of events in 1999. On May 26, 1999, a few months prior to the inception of Operation Refusal, the City Council enacted Local Law 20, which contained several amendments to Title 19 of the Administrative Code. One such amendment was the addition of § 19–512.1 to the Administrative Code, which provides that, "[t]he commission may, for good cause shown relating to a threat to the public health, or safety and prior to giving notice and an opportunity for a hearing, suspend a taxicab or for-hire vehicle license ... and, after notice and an opportunity for a hearing, suspend or revoke such a license." Admin. Code § 19–512.1.

After Mr. Glover filed his complaint, Operation Refusal soon followed. In an Enforcement Directive, dated November 11, 1999, TLC Chairperson Diane McGrath–McKechnie announced that unjustified service refusals constitute a threat to the public interest in violation of both § 2–50 (prohibiting service refusals) and § 2–61(a)(2) (prohibiting conduct against the public interest) of the TLC Rules.[2] *See* "Operation Refusal Enforcement Directive," Decl. of Jerald Horowitz, Ex. A ("Horowitz Decl. ___"). TLC Officers, upon observing an alleged service refusal, were instructed to issue summonses to the drivers for violations of both § 2–50 and § 2–61(a)(2). *See id.* TLC officers were further directed to summarily suspend and confiscate their taxicab licenses. *See id.* The TLC also began seeking penalties of suspension and revocation for first and second service refusal offenses pursuant to the penalty provisions of § 2–61(a)(2). *See* 35 RCNY § 2–86 (*providing for discretionary suspension or revocation for violations of § 2–61(a)(2)*). These penalties exceeded those previously applied in service refusal cases. On November 14, 1999, Mayor Giuliani followed up the Enforcement Directive by making the following announcement in his weekly radio address:

I have directed the New York City Police Department and Taxi and Limousine Commission to intensify their existing enforcement, particularly focusing on situations of cab drivers who refuse to pick up minority passengers or refuse to take any passenger to their destination. The idea is to send out additional undercover officers to hail cabs—and when cabbies don't stop or otherwise refuse to do their job in compliance with the law, the officers will fine them, suspend their licenses, and take their cabs to a police precinct until it can be picked up.

Rudolph W. Giuliani, *Prohibiting Discrimination by Taxi Drivers* (WINS radio broadcast, Nov. 14, 1999), Decl. of Daniel L. Ackman, Ex. 2.

On December 1, 1999, the TLC adopted § 8–16, which sets out the procedures to be applied when summarily suspending a drivers license. At the time of the summary suspension, TLC Officers must provide the driver with written notice of the summary suspension and of the availability of a summary suspension hearing. 35 RCNY § 8–16(c).[3] TLC Officers provide the driver with the following form notice:

You may request a hearing with respect to the continuation of this suspension by contacting the Commission. . . . This hearing will be scheduled within five (5) business days. At any such hearing you

---

**2.** Section 2–61(a)(2) states that "[a] driver, while performing his duties and responsibilities as a taxicab driver, shall not commit or attempt to commit, alone or in concert with another, any willful act of omission or commission which is against the best interests of the public, although not specifically mentioned in these Rules." 35 RCNY § 2–61(a)(2).

**3.** Rule 8–16(c) specifically states:
The Commission shall notify the licensee either by personal service or by both first class and certified mail of the summary suspension, within five (5) calendar days of the suspension. If the licensee wishes to receive a hearing concerning the suspension, he or she may request a hearing within ten (10) calendar days of receipt of the notice of suspension. Upon receipt of a request for a hearing, the Commission shall schedule a hearing, which shall be held within (10) calendar days of the request, unless the Commission determines that such hearing will be prejudicial to any ongoing civil or criminal investigation.
35 RCNY § 8–16(c). These procedures are presumably based on the procedures outlined in § 19–512.1 of the Administrative Code, which are identical. *See* Admin.Code § 19–512.1.

have the right to legal representation and to present evidence and witnesses on your behalf with respect to the issue of suspension. Your hearing on the charges will be held at the date and time indicated on the summons you received.

Horowitz Decl., Ex. B. The summary suspension hearing is held before a TLC ALJ, who "shall consider relevant evidence and testimony under oath." 35 RCNY § 8–16(d). As conceded by defendants at the June 29, 2000 oral argument, the scope of this hearing is limited to the summary suspension and consists of an examination of the driver's prior violations record and of the summons to insure it was properly issued. Tr. of Oral Argument at 16. The hearing does not provide an opportunity for the driver to present evidence challenging the underlying charge of service refusal upon which the summary suspension is based. The ALJ reviews the charges and, if the ALJ finds the summons includes violations of § 2–50 and § 2–61(a)(2), the summary suspension is upheld. The ALJ then issues a recommendation to the Chairperson to continue or discontinue the summary suspension, which the Chairperson may accept, reject or modify. 35 RCNY § 8–16(e).

The Chairperson's decision is the final decision of the Commission with respect to summary suspension. *Id.* If the Chairperson fails to render a decision on the summary suspension within sixty days of the conclusion of the suspension hearing, the suspension is stayed until a decision is made on the summary suspension. 35 RCNY § 8–16(f). This stay remains in place only until the Chairperson makes a decision as to whether to continue the summary suspension. Thus, if the Chairperson upholds the summary suspension, the TLC Rules do not indicate how long the driver must wait before being given a full hearing on the merits. No provision of § 8–16, or any other TLC Rule, requires a stay of the summary suspension pending a decision on the merits of the service refusal charges.

At the same time as the TLC introduced its summary suspension policy, it also began implementing Operation Refusal's suspension and revocation policy, by which the TLC sought to suspend or revoke taxicab licenses, after a hearing, for first and second service refusal offenses. Pursuant to the policy, which classifies a service refusal as conduct against the public interest, the TLC initiates suspension and revocation proceedings pursuant to § 2–86 of the TLC Rules, which provides for a fine, suspension, or revocation to be imposed as penalties for violations of § 2–61(a)(2). The suspension and revocation policy, inasmuch as it authorized discretionary suspension or revocation of licenses for service refusals, shifted the adjudication of service refusal charges from judges in the Office of Administrative Trials and Hearings ("OATH") to TLC ALJs. Pursuant to § 8–14(b) of the TLC Rules, when the penalties for a given charge do not include discretionary or mandatory revocation, the proceedings on the merits of that charge are commenced before OATH judges. 35 RCNY § 8–14(b). When the penalties for a charge do include discretionary or mandatory suspension or revocation, the proceedings shall be commenced before the Commission Adjudications Tribunal and heard by a TLC ALJ. *Id.* Because § 2–86, authorizes discretionary suspension or revocation of licences for violations of § 2–61(a)(2), service refusal proceedings brought under Operation Refusal are heard by a TLC ALJ.

TLC ALJs, unlike OATH judges, are employed by the TLC. The Chairperson schedules TLC ALJs to hear cases. The TLC ALJs are authorized to "make final findings of fact" and may only recommend

a final decision, determination or order. N.Y.C. Charter § 1046(e). Upon a finding of conduct against the public interest or welfare, the TLC ALJs may recommend revocation. This recommendation is then reviewed by the Chairperson, who may adopt, modify or reject the recommendation. 35 RCNY § 8–14(j). If the Chairperson adopts the recommendation, the license is revoked. The driver may appeal the Chairperson's decision to the full TLC within thirty days. 35 RCNY § 8–14(k).

### D. The Individual Plaintiffs

The individual taxicab driver plaintiffs were subject to Operation Refusal's summary suspension policy and suspension and revocation policy. The *Padberg* plaintiffs include Rashid Ahmed, John Padberg and Clifford Paolillo.[4] With respect to these plaintiffs, the Court reiterates the facts set forth in its prior opinion on their motion for preliminary injunction. *See Padberg*, 108 F.Supp.2d at 181–82.

### 1. Rashid Ahmed

On December 2, 1999, Ahmed asked a prospective fare where he was going, even though he had already illuminated his "Off Duty" light. The passenger told Ahmed his destination, and Ahmed refused to take him. The passenger, a New York City police officer who was working undercover as part of Operation Refusal, issued Ahmed two summonses for violations of § 2–50(b) (service refusal) and § 2–61(a)(2) (acting against the best interests of the public). He summarily suspended Ahmed's license and confiscated his taxicab. Several days later, Ahmed alleges that he appeared at the TLC offices in Long Island City for his "summary suspension hearing," but was told by the clerk

that nothing was scheduled on the matter for that day.

Almost three months later, Ahmed had a revocation hearing on the merits on February 24, 2000, before OATH ALJ McFaul. ALJ McFaul found that Ahmed had refused service for economic reasons, and recommended a fine of $300.00 pursuant to § 2–87(a)(1), the prescribed penalty for a first violation of § 2–50(b). As of the date of the preliminary injunction hearing before this Court on June 29, 2000, Chairperson McGrath–McKechnie had not yet rendered a final decision on Ahmed's case. Ahmed claimed that his suspension continued for seven months, while the TLC contends that his suspension was lifted sixty days after the revocation hearing, pursuant to § 8–16(f), apparently without notice to Ahmed. Ahmed's license to operate taxicabs expired on May 31, 2000.

### 2. John Padberg

On February 15, 2000, TLC agents Alston ("Alston"), who is African–American, and Bonilla ("Bonilla"), who is Caucasian, conducted a sting operation as part of Operation Refusal. Alston and Bonilla positioned themselves on consecutive blocks, with Bonilla a block behind Alston. As Padberg approached, Alston, and immediately thereafter Bonilla, attempted to hail him. Padberg stopped for Bonilla, whereupon Alston issued Padberg two summonses for violations of 2–50(b) and 2–61(a)(2), summarily suspended his license and confiscated his car. At Padberg's "summary suspension hearing" on February 18, 2000, TLC ALJ Schwartz noted sufficient allegations of service refusal, combined with a prior record of violations, warranted the continuation of the suspension.

---

**4.** Although Clifford Paolillo is a named plaintiff in this claim, no facts regarding his claim

have been provided.

A revocation hearing was held before TLC ALJ Elliott on March 6, 2000. ALJ Elliott found that Padberg had refused service in violation of § 2–50(b). Pursuant to TLC policy, Elliott found that the service refusal also constituted an act against the best interests of the public, in violation of § 2–61(a)(2). Elliott therefore recommended revocation. In response to this recommendation, Padberg submitted a letter and character references to TLC on March 31, 2000. After reviewing Padberg's submissions, Chairperson McGrath–McKechnie adopted the ALJ's recommendation on May 9, 2000, revoking Padberg's license. Padberg did not administratively appeal this ruling, and his time to do so expired on June 9, 2000.

### 3. Baig Plaintiffs

The *Baig* plaintiffs include Abid Baig, Mohammed Khan, Khalid Mahmood, Mulugheta Sultan and the NYTWA. All four taxi driver plaintiffs had their licenses summarily suspended pursuant to Operation Refusal. Baig's license was summarily suspended on November 12, 1999. Khan's license was summarily suspended on November 19, 1999. Mahmood's license was summarily suspended on December 2, 1999. Sultan's license was summarily suspended on April 7, 2000. In all four cases a summary suspension hearing was held before a TLC ALJ, and the summary suspension was upheld. Revocation proceedings were commenced before OATH judges for Baig, Khan, and Mahmood. In all three cases the OATH judges recommended against revocation. In Mahmood's case, his license was returned pending a final decision by the TLC on this recommendation. Mahmood Aff. ¶ 19. Revocation proceedings were commenced against Sultan before a TLC ALJ, who recommended revocation for violation of § 2–61. On August 3, 2000, Chairperson McGrath–McKechnie adopted the

ALJs recommendation and Sultan's license was revoked. Sultan filed a timely appeal with the TLC on August 10, 2000. As of the commencement of this suit in November 2000, the TLC had not decided that appeal and Sultan remained without his license.

NYTWA is a membership-based organization of approximately 2000 taxicab driver members with a stated mission of "fighting for the rights, respect, [sic] dignity of New York City taxi-drivers." Aff. of Bhairavi Desai ¶ 2 ("Desai Aff. ____"). The goal of NYTWA is to "create systematic, long-term changes, which will transform the daily conditions of all taxi-drivers." *Id.* The NYTWA commenced this action on behalf of its members and on its own behalf, claiming injury to its members and the organization itself. NYTWA claims that Operation Refusal has caused injury to its members by interfering with their ability to earn a livelihood. NYTWA also alleges that the organization itself has been harmed by being forced to expend scarce resources to defend individual members in TLC hearings, thus diverting resources from more broad-based efforts to improve working conditions in the taxi and limousine industry.

### DISCUSSION

Plaintiffs in both *Padberg* and *Baig* seek summary judgment on the ground that both Operation Refusal policies violated due process. First, plaintiffs maintain that Operation Refusal itself is not authorized by New York City law. Plaintiffs maintain, in the alternative, that both policies fail to provide the procedural safeguards necessary to satisfy due process. Defendants cross-move for summary judgment, arguing that the policies are authorized and do not violate plaintiffs' due process rights. As a threshold matter, defendants also challenge NYTWA's

standing to raise a § 1983 claim on its own behalf and on behalf of its members.

### A. Summary Judgment Standard

Summary judgment may not be granted unless "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden to show that no genuine issue of material fact exists lies with the moving party. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir.1994). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering cross-motions for summary judgment in which both parties assert an absence of a genuine issue of material fact, a court need not enter a judgment for either party, but must examine each motion separately and, in each case, draw all reasonable inferences against the moving party. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.2001); Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.1993).

### B. NYTWA's Standing

▉▉▉ Article III of the Constitution requires, at a minimum, that a plaintiff be able to demonstrate that, "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). An organization may attempt to assert standing on its own behalf, see Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n. 19, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), or on behalf of its members, see Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

▉▉▉ When asserting standing on its own behalf, an organization must be able to demonstrate some injury to the association itself that meets the three requirements above. See Havens, 455 U.S. at 378–79, 102 S.Ct. 1114. Because of the "injury in fact" requirement, NYTWA must demonstrate that it has more than simply "[an] abstract concern with a subject that could be affected by an adjudication [of the pending case]." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Nevertheless, having to divert scarce resources away from other organization activities as a result of the challenged conduct may qualify as an injury that confers standing. See Havens, 455 U.S. at 379, 102 S.Ct. 1114; Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir.1993); Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1526 (7th Cir. 1990). In both Havens and Ragin the plaintiff housing organizations were able to demonstrate they were forced to divert resources away from other activities, such as counseling and referral services for those seeking homes, in order to investigate and challenge defendants' discriminatory housing practices. Havens, 455 U.S. at 378–79, 102 S.Ct. 1114; Ragin, 6 F.3d at 905. The "opportunity cost" of such a diversion of resources is a sufficient injury to confer standing on the organization on its own behalf. See Village of Bellwood, 895 F.2d at 1526.

■ In the instant case, NYTWA has done more than show merely that Operation Refusal affects causes and issues that greatly concern the organization, an injury that is too abstract to confer standing. *See Simon,* 426 U.S. at 40, 96 S.Ct. 1917 (organizational plaintiff's mission to ensure all people were provided with adequate health care did not, by itself, give it standing to challenge a measure that limited the availability of health care and, consequently, made it more difficult for the organization to achieve its goals); *Nat'l Cong. For Puerto Rican Rights v. City of New York,* 75 F.Supp.2d 154, 164–65 (S.D.N.Y.1999) (organizational plaintiff's objective to combat discrimination against Puerto Ricans was too generalized to confer standing to challenge the unconstitutional practices of the Street Crimes Unit of the NYPD). NYTWA has demonstrated that it has suffered an "opportunity cost" similar to that experienced by the plaintiffs in *Havens* and *Ragin.* NYTWA points out that it seeks to devote its resources to activities aimed at achieving broader reform in the taxi and limousine industry by organizing taxi drivers and leading initiatives to ameliorate working conditions. Desai Aff. ¶ 4. As a result of Operation Refusal, the demand for more individualized services, such as representation at TLC hearings and counseling on TLC service refusal rules, has increased. NYTWA has adequately demonstrated that, as a result of Operation Refusal, it has had to divert greater resources to more individualized services and away from the reform efforts in which it engages. NYTWA, therefore, has standing on its own behalf.

■ However, NYTWA does not have standing to raise a § 1983 claim on behalf of its members. In general, an organization has standing to bring suit on behalf of its members only if it can demonstrate that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693 (citing *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)); *see also Warth,* 422 U.S. at 511, 95 S.Ct. 2197 (members of an association must show that the challenged conduct poses a threat of injury to them before an association can bring suit on their behalf). The Second Circuit, however, recognizes a limit on the organizational standing doctrine for claims brought under 42 U.S.C. § 1983. *See League of Women Voters of Nassau County v. Nassau County Bd. Of Supervisors,* 737 F.2d 155, 160 (2d Cir.1984). Because § 1983 creates only a personal cause of action, requiring that plaintiffs demonstrate that they personally suffer from a violation of their civil rights, an organization may not bring § 1983 claims on behalf of its injured members. *See id.* at 160 (citing *Aguayo v. Richardson,* 473 F.2d 1090, 1099 (2d Cir. 1973)); *National Cong. for Puerto Rican Rights,* 75 F.Supp.2d at 164.

In establishing this rule, the *Aguayo* court was careful not to run afoul of the line of Supreme Court precedents recognizing an organization's standing to assert a claim to vindicate its members' constitutional right of association. *See Aguayo,* 473 F.2d at 1099–1100. This type of organizational standing had been previously recognized by the Second Circuit in *Albany Welfare Rights Org. v. Wyman,* 493 F.2d 1319 (2d Cir.1974). Thus, a narrow exception to the Second Circuit rule barring organizations from asserting the § 1983 claims of its members continues to exist if the challenged conduct involves an abridgment of associational rights of "both the association and [its] members."

*Aguayo,* 473 F.2d at 1100; *see also Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin,* 46 F.Supp.2d 143, 152–53 (D.Conn.1999).

NYTWA has not claimed that Operation Refusal violates its members' right of association. At most, NYTWA argues that the aggressive nature of Operation Refusal "sends a message to drivers that the TLC has unbridled power to violate their rights, even if the agency's actions are unconstitutional, which obstructs our ability to effectively organize drivers within the industry." Desai Aff. ¶ 4. This stated effect does not articulate a claim that NYTWA members' associational rights have been violated. Moreover, the effect is purely hypothetical. It is just as plausible to believe that the more aggressive enforcement tactics utilized by the TLC would make it easier to organize drivers to protest these more aggressive measures. Thus, while NYTWA may bring a § 1983 claim for alleged violations of the organization's own civil rights, it has no standing to assert the § 1983 claims of its members.

### C. *Due Process Claims under § 1983*

■ To prevail on a § 1983 claim, plaintiffs must prove (1) that the challenged practices are attributable, at least in part, to a person acting under color of state law and (2) that the challenged practices deprive the plaintiffs of a right, privilege or immunity secured by the Constitution or laws of the United States. *See Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 136–37 (2d Cir.1999). The parties do not dispute that the individual defendants were acting under color of law. Moreover, there is no dispute that plaintiffs state a valid § 1983 claim against the municipal defendant, the TLC, based on the policy or practice identified as Operation Refusal. *See id.* at 137 (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694,

98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). The only issue is whether the challenged policies and practices violated plaintiffs' due process rights.

### 1. *Summary Suspension Policy*

Plaintiffs advance three arguments with respect to the TLC's summary suspension policy. First, plaintiffs argue that Chairperson McGrath–McKechnie and Mayor Giuliani denied them due process by initiating Operation Refusal without a vote of the full Commission which, plaintiffs maintain, is required by the N.Y.C. Charter. Second, plaintiffs contend that the practice of summarily suspending taxi licenses for service refusals violates due process because the Administrative Code does not grant the TLC the authority to take such measures. Finally, plaintiffs argue that summary suspension without a prior hearing violates due process. Defendants cross-move for summary judgment, arguing that the summary suspension policy is authorized by law and comports with the requirements of due process.

### a. *Procedural Due Process*

■ The Court begins by addressing plaintiff's final argument. Due process protects against arbitrary government action that deprives individuals of a protected interest. *County of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). As explained in this Court's prior decision denying the *Padberg* plaintiffs' motion for a preliminary injunction, *see Padberg,* 108 F.Supp.2d at 184–85, taxicab drivers have a property interest in their taxicab licenses sufficient to trigger due process protection. *See Mackey v. Montrym,* 443 U.S. 1, 11, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); *Dixon v. Love,* 431 U.S. 105, 112, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977); *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29

L.Ed.2d 90 (1971). However, due process does not forbid the deprivation of a protected property interest under all circumstances. Rather, procedural due process is a flexible concept that "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

 Plaintiffs' procedural due process challenge to the summary suspension procedures involves two separate questions: first, whether it was a violation of due process to deprive plaintiffs of their licenses prior to a hearing; and second, if a presuspension hearing was not constitutionally mandated, whether the procedures followed by the TLC in the postsuspension hearings were sufficient to protect plaintiffs' due process rights. In addressing these two questions, the Court has but a single task—to evaluate the particular circumstances presented by this case and determine "what process is due." *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593.

 Procedural due process generally requires that an individual be given notice and an opportunity to be heard before the government may deprive him of property. *Fuentes v. Shevin*, 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Nevertheless, the Supreme Court has recognized that due process "[does not] *always* require[ ] the State to provide a hearing prior to the initial deprivation of property." *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (emphasis in original), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Adequate postdeprivation procedures may satisfy due process requirements "where a State must act quickly, or where it would be impractical to provide predeprivation process." *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct.

1807, 138 L.Ed.2d 120 (1997). More specifically, the Supreme Court has stated that "an important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 930–31, 117 S.Ct. 1807 (quoting *FDIC v. Mallen*, 486 U.S. 230, 240, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988)).

In assessing what process is due, the Court is guided by the familiar balancing test enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). According to *Eldridge*, the Court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

 The weight of the private interest depends on both the nature of the private interest and the duration of the deprivation. *See Gilbert*, 520 U.S. at 932, 117 S.Ct. 1807 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)); *Mackey*, 443 U.S. at 12, 99 S.Ct. 2612. Plaintiffs' interest in their taxicab license is profound. Suspending their licences does far more than inconvenience drivers; it deprives them of their very livelihood. The Supreme Court has recognized on a number of occasions that a person's means of support enjoys heightened significance

as a property interest. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Bell*, 402 U.S. at 539, 91 S.Ct. 1586; *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Of these decisions, *Bell* is particularly notable. In that case, the Supreme Court specifically acknowledged that a driver's license, once issued, could become "essential to the pursuit of a livelihood." *Bell*, 402 U.S. at 539, 91 S.Ct. 1586. Such is undeniably the case with the plaintiff taxi drivers.

The interference with this significant private interest is further exacerbated by the duration of the summary suspension. On their face, the TLC Rules appear to have built-in protections to ensure that any such suspension does not last indefinitely. For example, the Rules provide that, if the driver contests his suspension, the TLC must grant him a hearing within ten days after they receive his request. 35 RCNY § 8–16(c). Nevertheless, this hearing is little more than a *pro forma* verification by the TLC ALJ that the summons was properly filled out with the defendant having no chance to present evidence in his favor.[5] Accordingly, it does nothing to limit the duration of the suspension. Indeed, in the case of plaintiff Ahmed, it was not until nearly three months after the date his summary suspension hearing was to take place that Ahmed was given a full hearing on the merits before an OATH judge. *See* Aff. of Rashid Ahmed ¶¶ 3–4. Thus, although the TLC Rules seem crafted to avoid delay and ensure prompt review of suspensions, in practice their protections are illusory. Drivers are still faced with the prospect of extended periods without the means to earn a living.

Turning to the second *Mathews* factor, the Court must evaluate the risk of errone-

ous deprivation in service refusal cases. In assessing this risk, it is important to remember that the TLC Rules do not contemplate a per se prohibition against service refusals in all circumstances. To the contrary, § 2–50(e) outlines no less than eleven situations in which a service refusal is justified. *See* 35 RCNY § 2–50(e)(1)–(11). Hence, there is considerable room for misinterpretation by the TLC inspector issuing the summons as to the reason for the refusal. Yet the drivers cited for violations under Operation Refusal are stripped of their licenses before they are afforded the opportunity to present their side of the story. Moreover, at the initial summary suspension hearing, they are not allowed to present evidence in their favor or challenge the allegation in any way. The fate of the drivers is therefore entirely dependent on the impressions of the TLC inspectors. Even the most experienced inspector can make an honest mistake, especially when he is asked to determine something as subjective as motive rather than actions. If the only issue were whether the driver failed to acknowledge a hail, the good faith allegations of a TLC inspector may be sufficient, at least initially, to suspend a license. Where, as here, the issue is not just whether a driver failed to acknowledge a hail, but rather whether he did so out of racial animus, or for any other unjustified reason, the obvious possibility for error and misinterpretation requires additional protection.

It is the subjective nature of the evidence in service refusal suspensions, *inter alia*, that distinguishes this case from other cases where predeprivation hearings were not required. *See Mackey*, 443 U.S. at 19, 99 S.Ct. 2612; *Dixon*, 431 U.S. at 115, 97 S.Ct. 1723; *Barry v. Barchi*, 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365

---

**5.** The nature of these summary suspension hearings is discussed in greater depth, *infra*.

(1979). In *Mackey,* a case involving a Massachusetts law mandating the summary suspension of a driver's license for refusing to take a breath-analysis test, the Supreme Court stressed that "perfect, error-free determinations" are not required, and that as long as there is "a reasonably reliable basis" to conclude that the officer's version of the facts was correct, that is enough to suspend a driver's license pending a prompt postdeprivation hearing. *Mackey,* 443 U.S. at 13, 99 S.Ct. 2612. Nevertheless, in that case, the risk of erroneous deprivation was far less because the suspension was based on objective facts. It is relatively easy to determine whether there is a legitimate reason to suspect someone of driving while intoxicated. The arresting officer will have the opportunity to observe the driver's condition and take note of the tell-tale signs of intoxication. Such readily verifiable evidence is not present in service refusal cases.

Both *Dixon* and *Barry* are similar to *Mackey* in this respect. In *Dixon,* the Supreme Court held that a predeprivation hearing was not necessary under an Illinois statute that provided for summary driver's license suspensions based on the driver's prior driving record. *See Dixon,* 431 U.S. at 115, 97 S.Ct. 1723. In *Barry,* the Supreme Court upheld the constitutionality of pre-hearing suspensions under a New York statute that provided for summary suspensions of a horse trainer's license if he knew, or had reason to know, that his horse had been drugged. *See Barry,* 443 U.S. at 66, 99 S.Ct. 2642. In both *Dixon* and *Barry,* as in *Mackey,* the nature of the infraction leaves little room for error. The driver's record in *Dixon* is not subject to interpretation or argument. Indeed, as the Court recognized, the only possible mistake that could call the suspension into question would be a clerical error that could be rectified quickly without a formal hearing. *See Dixon,* 431 U.S. at 113, 97 S.Ct. 1723. In *Barry,* a positive drug test is an objectively verifiable piece of evidence that, while not necessarily determining fault, is sufficiently reliable to support a suspension pending a prompt postsuspension hearing. *See Barry,* 443 U.S. at 65–66, 99 S.Ct. 2642. In the case at bar, the focus is not on fact, but on impressions readily susceptible to mistake and misperception.

Furthermore, in those cases in which the Supreme Court has upheld summary suspensions without a hearing, the availability of prompt, meaningful postsuspension procedures to rectify any erroneous or questionable deprivation has been a critical component of their analysis. In *Mackey,* the statute entitled the driver to an immediate postsuspension hearing before the Registrar of Motor Vehicles. *See Mackey,* 443 U.S. at 7 n. 5, 99 S.Ct. 2612. In *Barry,* although the Supreme Court held that the lack of a predeprivation hearing was constitutionally permissible, the lack of any substantive postdeprivation hearing violated due process. *See Barry,* 443 U.S. at 66, 99 S.Ct. 2642. As the Court stated, "[o]nce suspension has been imposed, the [license holder's] interest in a speedy resolution of the controversy becomes paramount," and an "early and reliable determination" of the facts becomes a matter of constitutional imperative. *Id.*

In the instant case, the available postsuspension procedures provided little, if any, protection of the taxicab driver's due process rights. As previously mentioned, the TLC Rules appear on their face to provide quick review of the summary license suspensions. *See* 35 RCNY § 8–16(b) (requiring revocation proceedings to begin within five calendar days of the summary suspension); 35 RCNY § 8–16(c) (providing for summary suspension hearings within ten days of receipt of the driver's request for a hearing). Nevertheless,

countless affidavits from taxicab drivers who challenged their suspensions reveal that the seemingly strict protections embodied in the TLC Rules were more honored in the breach than the observance. At these summary suspension hearings the drivers were not allowed to speak on their behalf or present evidence in their defense. *See* Aff. of Khalid Mahmood ¶ 5; Aff. of Mulugheta Sultan ¶ 5; Aff. of Carl Joseph ¶ 5; Aff. of Adam M. Madibo ¶ 5; Aff. of Ibrahima Mbengue ¶ 6. Indeed, the TLC inspectors who issued the summonses were not required to appear and, in most cases, did not. *See* Mahmood Aff. ¶ 5; Sultan Aff. ¶ 5; Madibo ¶ 5; Mbengue Aff. ¶ 6.

 While the Court recognizes that "something less than an evidentiary hearing is sufficient prior to adverse administrative action," *see Mathews,* 424 U.S. at 343, 96 S.Ct. 893, certainly what took place here fell far short of providing the drivers with the opportunity to be heard "in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). Instead, critical questions of fact and credibility were left unresolved until long after the summary suspensions. When the procedures in place do not allow for the presentation of potentially exculpatory evidence, there is little doubt that due process rights are in jeopardy. *See Bell,* 402 U.S. at 542, 91 S.Ct. 1586 ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether [to suspend a license] does not meet [the] standard [of a meaningful hearing]."). In a similar fashion, when the postsuspension procedures are as perfunctory as those used in this case, the risk of erroneous deprivation increases exponentially.

 Finally, the third *Mathews* factor—the government's interest—counsels

in favor of additional protections. A service refusal on the basis of race is a deplorable and unacceptable practice. The TLC is right to aggressively pursue those taxicab drivers who engage in such practices. But aggressive enforcement of TLC policy, no matter how laudable or necessary, must conform to the mandates of the Constitution. As a general rule, depriving someone of a property interest prior to a hearing will be condoned only in "extraordinary situations." *Fuentes,* 407 U.S. at 90, 92 S.Ct. 1983 (citing *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). These circumstances exist not just when there is an important government interest at stake, but also when "very prompt action is necessary." *United States v. All Assets of Statewide Auto Parts,* 971 F.2d 896, 903 (2d Cir.1992) (citing *Fuentes,* 407 U.S. at 91, 92 S.Ct. 1983).

Typically, the Supreme Court has allowed deprivation prior to a hearing in cases involving pressing and immediate threats to the public health and safety. *See Mackey,* 443 U.S. at 17, 99 S.Ct. 2612 ("We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety."). In *Mackey,* where the statute in question was designed to remove potential drunk drivers from the road, the State of Massachusetts clearly had a compelling need for immediate action. To allow the driver to retain his license under such circumstances would place lives in danger. Moreover, as the Court noted, providing for a presuspension hearing would encourage drivers to refuse to take the breathanalysis test, thereby compromising the goal of ensuring safety on public highways. *See id.* at 18, 99 S.Ct. 2612. Both *Dixon* and *Barry* involved similar concerns. In *Dixon,* the statute provided for summary suspension of a driver's license if the driv-

er accumulated too many moving violations. As in *Mackey,* the very serious threat to public safety posed by a repeatedly irresponsible driver warranted a prompt response. *See Dixon,* 431 U.S. at 114, 97 S.Ct. 1723. In *Barry,* although the Court did not specifically address why immediate action was necessary, the prospect that the trainer might drug other horses, irreparably impacting the fairness of the race and wagering, made the need for immediate action obvious.

In this case, although racially-motivated service refusals perpetuate the problem of racial discrimination and those who commit such offenses must be held accountable, the circumstances do not present the sort of immediate threats to health and safety that would permit summary suspension. If a taxicab driver has refused service on the basis of race, the Court sees little danger in holding him accountable at most ten days later at a meaningful hearing on the merits. Thus, the Court is not suggesting that these offenders slip through the cracks, but rather that the urgency to impose summary discipline is not as great as with other conduct. Prompt, meaningful suspension hearings held less than two weeks after an alleged service refusal would meet the TLC's legitimate goal, providing the same impact and deterrent effect.

Furthermore, the Court notes that it would be no additional burden for the TLC to provide appropriate procedures in service refusal cases. According to § 8–16(b), as long as the driver does not request a summary suspension hearing pursuant to § 8–16(c)–(d) to contest the validity of the suspension, he is entitled to a full revocation proceeding no more than five calendar days after the suspension. *See* 35 RCNY §§ 8–16(b)–(d). Thus, the TLC seems already equipped to handle the demand for such hearings. Indeed, as the Court pointed out in its previous opinion, transforming these revocation hearings into summary suspension hearings involving a discussion of the merits of the case may, in fact, eliminate the need for two separate hearings.

As a final point, it is worth remembering that the TLC's goal in implementing Operation Refusal was to eliminate racial discrimination among cab drivers. Nevertheless, in practice Operation Refusal mandates summary suspensions for any kind of service refusal, whether it is race-based or not. The Operation Refusal Enforcement Directive says nothing about specifically targeting race-based refusals, but rather dictates that all violations of § 2–50 will be remedied by summary license suspension. *See* "Operation Refusal Enforcement Directive," Horowitz Decl., Ex. A. This would include such comparatively innocuous infractions as destination-based service refusals. *See* 35 RCNY § 2–50(a)–(b). Thus, the TLC has diluted the strength of its interest somewhat by casting its net too wide, sweeping in the merely irksome offenses with the truly invidious.

Given the strength of the taxi drivers' compelling interest in their licenses and the substantial risk of erroneous deprivation balanced against the important, but not immediate, need for the TLC to discipline those who refuse service, the Court finds that depriving the plaintiffs of a pre-suspension hearing violated their due process rights. Moreover, even if due process were not to require a presuspension hearing under these circumstances, the procedures followed in the summary suspension hearings were inadequate to safeguard plaintiffs' due process rights. The Court believes it would be inappropriate to specify exactly what form a proper summary suspension hearing should take, other than to reiterate that plaintiff must be afforded

some meaningful opportunity to address the merits of his case. *See Bell,* 402 U.S. at 542, 91 S.Ct. 1586 (declining to specify what would constitute appropriate proceedings other than to state that they must at least allow for a determination of whether the action taken against the driver was a mistake); *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487 (noting that while a full evidentiary hearing is not usually required, the one being deprived of his property must be given at least "an opportunity to present his side of the story"). Whether this takes the form of a full evidentiary hearing or "something less," *see Mathews,* 424 U.S. at 343, 96 S.Ct. 893, is not for the Court to decide. Accordingly, plaintiffs' motion for summary judgment on their procedural due process claim challenging summary suspension is granted. Defendants' cross-motion is denied.

### 2. Suspension and Revocation Policy

Plaintiffs also challenge on similar due process grounds the TLC's practice of suspending taxicab licenses, after a hearing, for first and second service refusal offenses. Plaintiffs contend that the TLC lacks authority under the Administrative Code to impose such a penalty, even after a hearing. Plaintiffs also maintain that this practice, like the practice of summarily suspending taxicab licenses without a hearing, is unauthorized because Mayor Giuliani and Chairperson McGrath–McKechnie implemented it without the formal approval of the full TLC. Plaintiffs also contend that even if the policy is authorized, § 2–61(a)(2) of the TLC Rules, which prohibits conduct "against the best interests of the public," and which plain-

tiffs were found to have violated, is unconstitutionally vague. Finally, plaintiffs argue that the suspension and revocation hearings, conducted by TLC ALJs, suffered from bias, rendering them ineffective to protect plaintiffs' due process rights.[6]

### a. Substantive Due Process

Plaintiffs' first and second arguments advance substantive due process claims, as opposed to procedural due process claims. By asserting that the Mayor, the Chairperson and the TLC were acting beyond the scope of the authority granted to them, plaintiffs are not focusing on the procedures followed at the hearings where their licenses were suspended or revoked,[7] but rather on the notion that, regardless of the adequacy of the procedures, these penalties were unauthorized and should never have been imposed. *See Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (substantive due process safeguards an individual's right to life, liberty and property against "certain government actions regardless of the procedures used to implement them"); *see also Amsden v. Moran,* 904 F.2d 748, 754 (1st Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991) ("As distinguished from its procedural cousin . . . a substantive due process inquiry focuses on 'what' the government has done, as opposed to 'how and when' the government did it.").

While the Supreme Court has recognized that the due process clause has a substantive component, it has nevertheless been wary of "expand[ing] the concept

---

**6.** The Court notes for clarification that the hearings discussed in this section are not the "summary suspension hearings" referred to in the previous section, which the Court has determined violate plaintiffs' procedural due process rights. The hearings referred to in

this section were hearings on the merits conducted by TLC ALJs.

**7.** Plaintiffs' procedural due process claims regarding the adequacy of the suspension and revocation hearings are addressed *infra.*

of substantive due process because guide-posts for reasonable decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Accordingly, the protections of substantive due process are limited to government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense, *but not against government action that is incorrect or ill-advised." Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (emphasis added) (quotation marks and citations omitted); *see also Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995). As the Second Circuit explained:

> Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.

*Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999); *see also County of Sacramento v. Lewis,* 523 U.S. at 846, 118 S.Ct. 1708 ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,' ") (quoting *Collins,* 503 U.S. at 129, 112 S.Ct. 1061). Indeed, even a violation of state law may not rise to the level of arbitrary and outra-geous conduct. *See Adler v. County of Nassau,* 113 F.Supp.2d 423, 430 (E.D.N.Y. 2000) (citing *Natale,* 170 F.3d at 263); *cf. Amsden,* 904 F.2d at 757 ("[A] regulatory board does not transgress constitutional due process requirements merely … by making 'demands which arguably exceed its authority under the relevant state statutes.' ") (citation omitted). It is only when government officials "exercise [their] power without any reasonable justification in the service of a legitimate governmental objective" that substantive due process is violated. *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708.[8]

 Plaintiffs first contend that Mayor Giuliani and Chairperson McGrath-McKechnie circumvented the procedures in the N.Y.C. Charter by initiating the summary suspension policy of Operation Refusal without a vote of the full Commission. As plaintiffs point out, the N.Y.C. Charter states, "A majority of the whole number of members of the commission then in office shall constitute a quorum for the transaction of any business. The commission shall have power to act by a majority of its members." N.Y.C. Charter § 2301(e). Plaintiffs argue that § 2301(e) mandates that better than fifty percent of the commissioners must vote to approve a measure such as Operation Refusal. However, the N.Y.C. Charter also states that the TLC Chairperson shall act as "chairman and chief executive officer" of the Commission, with the authority to "em-

---

**8.** Plaintiffs cite *Salahuddin v. Coughlin,* 781 F.2d 24 (2d Cir.1986) for the proposition that imposing penalties in excess of those authorized by state law constitutes a violation of due process. *See id.* at 27 n. 4. That case involved a prisoner who was confined in a Special Housing Unit even though a court had granted his habeas corpus petition challenging that punishment. Although this Court observed in its opinion denying plaintiffs' motion for preliminary injunction that one could argue by analogy that revocation of a driver's license, when not authorized by state law could violate due process, *see Padberg,* 108 F.Supp.2d at 185, the Court concludes that *Salahuddin* does not stand for the proposition that every violation of state law constitutes a violation of due process. As the Second Circuit itself stated in *Salahuddin,* "Every violation of state law is not a necessarily a denial of constitutional right." *Salahuddin,* 781 F.2d at 27 n. 4.

ploy, assign and superintend the duties of such officers and employees as may be necessary to carry out the provisions of this chapter." N.Y.C. Charter § 2301(c). This provision, defendants assert, grants Chairperson McGrath–McKechnie a general supervisory authority over TLC agents and employees that gave her the power to implement certain policy directives on behalf of the full Commission.

Plaintiffs contend that § 2301(c) cannot supersede the clear directives of § 2301(e) and that any such interpretation is patently erroneous. However, as previously explained, merely "incorrect" or "ill-advised" government action does not violate substantive due process. *Lowrance,* 20 F.3d at 537. Even assuming that a vote were required, Chairperson McGrath–McKechnie had at least a reasonable basis to believe that she did possess the authority to initiate Operation Refusal under § 2301(c). Her action, even if unauthorized by the Charter, cannot be considered a "gross abuse" of her power rising to the level of a constitutional violation. *Natale,* 170 F.3d at 263; *see also Amsden,* 904 F.2d at 757 (official does not violate due process by arguably exceeding the authority granted to him). Nor is it entirely clear that Chairperson McGrath–McKechnie's understanding of her own authority was incorrect. Plaintiffs have provided no authority, other than the language of the N.Y.C. Charter itself, supporting the proposition that the Chairperson needed the vote of the Commission to promulgate an enforcement policy such as Operation Refusal. With only the language of the Charter to follow, the Court cannot say with certainty that Chairperson McGrath–McKechnie's actions were even unauthorized, much less that they were arbitrary in the constitutional sense.

 Moreover, there is nothing to suggest that Chairperson McGrath–McKech-

nie or Mayor Giuliani were prompted to act by anything but legitimate motives. Both were attempting to rectify the problem of race-based service refusals among taxicab drivers by increasing the penalties imposed for such an infraction. Plaintiffs' bare allegation that Mayor Giuliani initiated this new enforcement program in response to a highly publicized complaint in order to further his own political purposes, if credited, does not render the conduct a gross abuse of government authority. The Mayor was responding to a matter of public concern. The fact that a public official may derive political benefit from his or her pursuit of an otherwise legitimate government objective does not make that objective any less legitimate. In sum, these are not the type of egregious government actions that offend substantive due process.

 Plaintiffs next contend that the practice of suspending and revoking taxi licenses, after a hearing, for first and second service refusal offenses violates due process because the Administrative Code does not authorize such a penalty. To understand the issue presented, we must first examine the interplay between the N.Y.C. Charter, the Administrative Code and the TLC Rules. As previously mentioned, the N.Y.C. Charter delegates to the TLC the authority to regulate and supervise several aspects of the city's transportation industry, including "[t]he revocation and suspension of licenses for vehicles" and "[t]he issuance, revocation, suspension of licenses for drivers, chauffeurs, owners or operators of vehicles." N.Y.C. Charter § 2303(b)(3) & (b)(5). Pursuant to this authority, the TLC promulgates rules establishing the agency's policies and procedures with respect to license suspension. Nevertheless, despite this broad grant of rule-making authority, a rule adopted by the TLC cannot conflict with a statute passed by the City Council. It is well-

settled that "an agency cannot 'promulgate rules in contravention of the will of the Legislature.' " *Matter of Beer Garden, Inc. v. New York State Liquor Auth.,* 79 N.Y.2d 266, 276, 582 N.Y.S.2d 65, 590 N.E.2d 1193 (1992) (quoting *Finger Lakes Racing Ass'n v. New York State Racing & Wagering Bd.,* 45 N.Y.2d 471, 480, 410 N.Y.S.2d 268, 382 N.E.2d 1131 (1978)); or revoke a license even for a first service refusal offense. Section 19–505(1) of the Code states, "[t]he commission may, after a hearing, suspend or revoke any driver's license ... for failure to comply with the commission's rules and regulations." Admin.Code § 19–505(1). Thus, despite the existence of the more specific penalty scheme for service refusals found in § 19–507, § 19–505(1) may be employed to impose penalties above and beyond those in § 19–507. Furthermore, defendants maintain that a violation of § 2–61(a)(2) of the TLC Rules is an entirely separate offense from a service refusal and therefore the TLC may proceed against a driver under both rules for the same incident. Section 2–61(a)(2) carries its own stiffer penalty. *See* 35 RCNY § 2–86 (providing for a penalty of "$150–350 and/or suspension up to 30 days or revocation" for a violation of § 2–61(a)(2)). Thus, even if the TLC is precluded from suspending or revoking licenses for a first service refusal offense under § 2–50, it can do so for a first offense violation of § 2–61(a)(2) without running afoul of the limitations imposed by § 19–507 of the Administrative Code. Accordingly, defendants assert that Operation Refusal's suspension and revocation policy is authorized under the Administrative Code.

Regardless of whether plaintiffs or defendants are correct in their interpretation of the law, plaintiffs' argument that defendants violated substantive due process by suspending and revoking their licenses for a first or second service refusal offense is unavailing. As previously explained, substantive due process does not protect against government action that is merely "incorrect or ill-advised." *Lowrance,* 20 F.3d at 537. In this case, defendants were relying upon a validly adopted TLC Rule ( § 2–61(a)(2)) and an Administrative Code provision ( § 19–505(1)) that at least arguably gave the TLC the power to impose penalties of license suspension and revocation for first and second service refusal offenses. It may indeed be true that § 19–507 of the Administrative Code limits the authority of the TLC to impose such penalties. Several OATH judges and state court judges who have addressed this issue have taken that position. *See Taxi and Limousine Comm'n v. Ouali,* OATH Index No. 1855/00 (Feb. 16, 2001); *Taxi and Limousine Comm'n v. Park,* OATH Index No. 1014/00 (Feb. 2, 2000); *Taxi and Limousine Comm'n v. Asamoah,* OATH Index No. 1120/00 (Feb. 2, 2000); *Pierre–Lys v. New York City Taxi and Limousine Comm'n.,* Index No. SCNY7048/00, 2002 WL 338187 (N.Y.Civ.Ct. Jan. 14, 2002). However, it cannot be said that the TLC was exercising its power in an arbitrary or oppressive way.

In this respect, this case is similar to *Rosa R. v. Connelly,* 889 F.2d 435 (2d Cir.1989). In that case, the Bridgeport Superintendent of Schools first suspended, and then expelled, a student for bringing a loaded gun to school. *Id.* at 436. The student was expelled for the maximum allowable time period under Connecticut law, 180 days, but was not given credit for the three months he was absent from school prior to the expulsion hearing. *Id.* The student's mother brought a § 1983 suit claiming, *inter alia,* that the failure to credit the time the student was absent from school towards the 180–day time period in effect lengthened the expulsion penalty beyond the allowable limits of

state law and therefore deprived the student of his property right to education in violation of substantive due process. *See id.* at 437. The Second Circuit affirmed the district court's grant of summary judgment, agreeing with the district court that it was immaterial that the Superintendent may have misinterpreted Connecticut law. *See id.* at 439. The deprivation would only be arbitrary and therefore violate substantive due process "in a rare case where there is no rational relationship between the punishment and the offense." *Id.* (internal quotation marks omitted). Because the superintendent could articulate valid reasons for not crediting the time the student was absent from school, there was no substantive due process violation. *Id.*

Such is the case here. Defendants were acting pursuant to authority that they believed they possessed in order to further the legitimate interest of eliminating racial discrimination among taxicab drivers. Regardless of whether defendants' interpretation of the TLC Rules and the Administrative Code may have been incorrect, suspending or revoking licenses for race-based service refusals was not arbitrary or irrational and therefore did not violate substantive due process. *See id.; see also Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 145 (2d Cir. 1994) (administrative agency's policy statement that only New York pilots could operate vessels in New York waters in Long Island Sound, though based on an erroneous interpretation of statutory law, nevertheless did not violate Connecticut pilots' substantive due process rights). *See id.* at 145.

*b. Procedural Due Process*

Plaintiffs also challenge the suspension and revocation policy on two procedural due process grounds. First, plaintiffs assert that § 2–61(a)(2) of the TLC Rules,

which prohibits conduct that threatens "the best interests of the public," is unconstitutionally vague and therefore cannot serve as the basis for suspending or revoking their licenses. Second, plaintiffs contend that they were denied a fair hearing because the TLC ALJ's who presided over their suspension hearings were tainted by bias. Plaintiffs do not seek summary judgment on the basis of this final argument. Rather, they contend that the evidence of bias in TLC ALJ adjudications is strong enough to defeat defendants' cross-motion for summary judgment with respect to the suspension and revocation policy until further discovery is obtained. We begin first with plaintiffs' vagueness challenge.

 Prior to imposing civil penalties for violation of a regulation, due process requires that the regulation be sufficiently specific to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The level of specificity required will vary depending on "the nature of the enactment." *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Generally speaking, courts will be more tolerant of vagueness if the penalty imposed by the statute is civil, rather than criminal or quasi-criminal, and if the statute does not threaten to interfere with constitutionally protected rights, such as free speech. *Id.* at 498–99, 102 S.Ct. 1186. In the context of agency regulations, it is enough that "a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objective the regulations are meant to achieve, has fair warning of what the regulations require." *Rock*

*of Ages Corp. v. Sec'y of Labor,* 170 F.3d 148, 156 (2d Cir.1999).

 Section 2–61(a)(2) of the TLC Rules provides:

> [a] driver, while performing his duties and responsibilities as a taxicab driver, shall not commit or attempt to commit, alone or in concert with another, any willful act of omission or commission which is against the best interests of the public, although not specifically mentioned in these Rules.

35 RCNY § 2–61(a)(2). The TLC was established with the general purpose of "the continuance, further development and improvement of taxi and limousine service in the city of New York." N.Y.C. Charter § 2300. A taxicab driver should therefore understand the prohibition against "any willful act of omission or commission which is against the public interest" in the context of the TLC's purpose to, *inter alia,* establish service standards and ensure public access to quality taxi and limousine service. *See Rock of Ages,* 170 F.3d at 156 ("[A] reasonably prudent mine operator would take the Mine Act's objectives into account when determining its responsibilities to comply with a regulation promulgated thereunder."). Discriminatory service refusals, by definition, interfere with the TLC's objective of providing taxi and limousine service throughout New York City. Accordingly, a reasonably prudent taxicab driver, presumed to be familiar with TLC rules and TLC objectives, has more than fair warning that an unjustified denial of service is conduct against the specific public interests which the TLC was created to serve.

 Given the deferential standard used to assess statutes that impose civil penalties for conduct that is not constitutionally protected, *see Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. 1186, the Court declines to hold § 2–61(a)(2) of the TLC Rules unconstitutionally vague as applied to plaintiffs.[9] In so doing, the Court draws support from the conclusion already reached by the Appellate Division that the "public interest" standard used in TLC Rule 2–61(a)(2) is not unconstitutionally vague as applied to those who sexually harass passengers. *See Fernandez v. New York City Taxi and Limousine Comm'n,* 193 A.D.2d 423, 423, 597 N.Y.S.2d 337 (1st Dep't 1993).

 Finally, plaintiffs claim that the TLC ALJs who conducted the suspension and revocation proceedings were biased. Due process requires a "fair trial in a fair tribunal." *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). "[A]dministrative agencies which adjudicate" are bound by this rule as well as courts. *Id.* A biased decision-maker renders the proceeding unconstitutional. *Id.* at 47, 95 S.Ct. 1456. There are a few situations, such as when the adjudicator has a pecuniary interest in the outcome of the case, where the Supreme Court has recognized that the risk of bias is strong enough that the proceedings will not satisfy due process. *See id.* (collecting cases). As a general rule, however, "those serving as adjudicators" are entitled to a "presumption of honesty and integrity." *Id.* Thus, it is not enough to show that the adjudicator is employed by the agency that investigates and prosecutes the cases that come before him. *See, e.g., Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 985 F.Supp. 316, 319 (E.D.N.Y.1997) (fact

---

**9.** To the extent that plaintiffs are raising a facial challenge to § 2–61(a)(2), their claim must fail. A plaintiff whose conduct is proscribed by the statute may not bring a facial vagueness challenge. *Hoffman Estates,* 455 U.S. at 495 n. 7, 102 S.Ct. 1186.

that the hearing officer in a name-clearing hearing for a terminated assistant principal was employed by the school district and the Board of Education not enough to show bias). Plaintiffs can only overcome the presumption of honesty by showing that, "under a realistic appraisal of psychological tendencies and human weakness," the circumstances surrounding the proceedings posed "a risk of actual bias or prejudgment" that would offend due process. *Id.; see also Gibson v. Berryhill,* 411 U.S. 564, 578, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (noting that bias could arise from either "prejudgment of the facts or personal interest").

Plaintiffs maintain that the TLC ALJs were well aware of the TLC's desire to impose harsher punishment for service refusals and were receiving pressure to impose penalties of license suspension and revocation for first and second service refusal offenses. Plaintiffs draw the Court's attention to the memorandum sent on February 18, 2000, by Chief Administrative Law Judge Lisa Rana to the rest of the TLC ALJs concerning adjudication of service refusal cases under Operation Refusal. In the memorandum, ALJ Rana advised the TLC ALJs that taxi drivers who committed unjustified service refusals were being cited by TLC agents under both § 2–50 and under § 2–61(a)(2). *See* Memorandum of Chief Administrative Law Judge Lisa Rana, *Baig* Pls.' Mem. of Law in Supp., Ex. E ("Rana Memo"). ALJ Rana then stated the following:

> Please be advised that, upon a finding of a refusal, the Commission's policy requires that both the Rule 2–50B **and** Rule 2–61A2 violations be sustained. Furthermore, where the Commission is seeking revocation in an Operation Refusal case, if the ALJ does find a violation of Rule 2–50B and Rule 2–61A2, the ALJ must submit to the Chairperson a recommended decision for the Rule 2–61 A2 violation.

Rana Memo (emphasis in original). Plaintiffs maintain that this memorandum was designed to influence the fact-finding process of the TLC ALJs and to pressure the TLC ALJs to impose the heightened penalties that the TLC desired. Plaintiffs further assert that the TLC ALJs were especially vulnerable to this pressure because ALJ Rana was in charge of assigning cases to TLC ALJs. Plaintiffs maintain that further discovery is needed to determine whether those ALJs that recommended the harsher penalties were assigned more cases and therefore paid more or whether the ALJs believed or had reason to believe that a recommendation of suspension or revocation would result in them being assigned more cases on the schedule.

The evidence of possible bias among TLC ALJs, while not overwhelming, is enough to defeat defendants' cross motion for summary judgment. The Rana Memo raises a legitimate question as to whether the TLC ALJs were finding violations of both rules based on the facts of the case, or whether they were "prejudging the facts" and merely tacking on a finding of liability under § 2–61(a)(2) and revoking licenses pursuant to the TLC policy. Indeed, plaintiffs point out that the ALJ's recommendation for defendant Padberg states simply, "With regard to the Rule 2–61A2 violation, it is the policy of the Commission that a finding of a service refusal is sufficient to establish that the respondent acted against the best interests of the public. Accordingly, I find and conclude that respondent is guilty of violating Rule 2–61A2." Aff. of John Padberg, Ex. 1. Furthermore, there is some evidence that TLC ALJs were recommending penalties of suspension and revocation in service refusal cases far more than OATH judges who handled the same cases. Taking the

plaintiffs in this case as a sample, the OATH judges who adjudicated the cases of Ahmed, Baig, Kahn and Mahmood all recommended against license revocation, whereas the TLC ALJs who heard the cases of Padberg and Sultan both recommended revocation.[10] Given this evidence, the Court agrees with plaintiffs that genuine issues of fact remain and that plaintiffs have the right to reasonable and focused discovery on the limited issue of potential systemic incentives and possible bias among the TLC ALJs.

### D. Preliminary Injunction

■ The *Baig* plaintiffs seek a preliminary injunction (1) enjoining the TLC from continuing to summarily suspend taxicab licenses upon a charge of service refusal and ordering the return of licenses summarily suspended pursuant to this policy and (2) enjoining the TLC from suspending and revoking taxicab drivers licenses, after a hearing, for a first or second service refusal offenses and ordering the return of licenses already suspended or revoked pursuant to this policy. To qualify for preliminary injunctive relief, the *Baig* plaintiffs must show irreparable harm and "either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in [their] favor." *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (internal quotation marks omitted).

We begin first with the *Baig* plaintiffs' two requests relating to the TLC summary suspension policy. As previously explained, the TLC's summary suspension

practices violate due process. Clearly, then, the *Baig* plaintiffs have shown a likelihood of success on the merits. Moreover, the Second Circuit has recognized that the loss of a business constitutes irreparable harm. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37 (2d Cir.1995). Nevertheless, the Court need not grant preliminary injunctive relief to remedy any future continuation of the summary suspensions, as the TLC may not employ practices that the Court has found violate due process. On the other hand, plaintiffs whose licenses were summarily suspended and who have not yet been granted a hearing on the merits are entitled to an injunction to have their licenses returned.

■ The harder question is whether a preliminary injunction should issue enjoining the second challenged practice—the suspension and revocation of licenses, after a hearing, for first and second service refusal offenses. As stated above, this practice does not violate substantive due process. Moreover, the Court continues to have doubts that plaintiffs will be successful on the merits of their procedural due process challenge to this practice. The rules relied on to invoke the penalty of suspension and revocation for first and second service refusal offenses are not unconstitutionally vague, and the only evidence of bias plaintiffs point to is the fact that adjudications on the merits of these charges take place before TLC ALJs. While the Court agrees with plaintiffs that they are entitled to discovery on this limited point, for preliminary injunction purposes, the Court remains unconvinced that plaintiffs will be able to overcome the strong presumption established in *With-*

---

**10.** It should also be noted that Operation Refusal's practice of pursuing service refusal offenders under both § 2–50 and § 2–61(a)(2) allowed the TLC to shift the adjudication of these cases from OATH judges to TLC ALJs.

*See* 35 RCNY § 8–14(b) (rule violations that provide for discretionary penalties of license suspension and revocation, such as § 2–61(a)(2), may be tried before a TLC ALJ instead of OATH judges).

**290**

*row* that those who serve as adjudicators are possessed of honesty and integrity. *See Withrow*, 421 U.S. at 47, 95 S.Ct. 1456. Accordingly, preliminary relief enjoining the continued suspension and revocation of licenses for first and second service refusal offenses is denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is granted with respect to their due process challenge to the TLC practice of summarily suspending taxicab licenses under Operation Refusal. Plaintiffs' motion for summary judgment is denied with respect to their due process challenge to the TLC practice of suspending and revoking taxicab licenses, after a hearing, for first and second service refusal offenses. Defendants' cross-motion for summary judgment is granted with respect to all of plaintiffs' substantive due process claims and plaintiffs' vagueness challenge to 35 RCNY § 2–61(a)(2), but denied with respect to plaintiffs' procedural due process challenge to the suspension and revocation of licenses, after a hearing, for first and second service refusal offenses on grounds of possible bias among the TLC ALJs. This final claim is, therefore, the only one remaining before this Court.

Defendants are hereby ordered to return taxicab licenses that were summarily suspended pursuant to Operation Refusal to those drivers who have not yet received a determination on the merits.

The parties are directed to contact Magistrate Judge Gold to establish a discovery schedule.

SO ORDERED.