The NEW YORK STATE RESTAURANT ASSOCIATION, et al., Plaintiffs,

v.

NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, et al., Defendants.

No. 03 CV 2864 JG RML.

United States District Court, E.D. New York.

Jan. 12, 2004.

Michael A. Cardozo, Corporation Counsel of the City of New York by Deborah Rand, Esq., New York City, for Plaintiffs.

Thacher Proffitt & Wood LLP by Robert Hermann, Esq., Doreen Klein, Esq., White Plains, NY, for Defendants.

## MEMORANDUM AND ORDER

LEVY, United States Magistrate Judge.

Defendants move to dismiss plaintiffs' amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a cause of action. This motion is before me on consent of the parties, pursuant to 28 U.S.C. § 636. For the reasons stated below, defendants' motion is granted.

### BACKGROUND AND FACTS

Plaintiff New York State Restaurant Association ("NYSRA") is a "statewide not-for-profit organization of restaurant owners and operators representing more than 7000 food service operations, many of them in New York City." (Amended Complaint, dated Sept. 3, 2003 ("Amended Compl."), ¶ 4.) The remaining plaintiffs are forty-four New York City restaurants, all of which are licensed by defendant New York City Department of Health and Mental Hygiene ("DOHMH") and most of which are members of NYSRA. (*Id.* ¶ 5.) Plaintiffs seek a declaratory judgment and injunction with respect to certain rules and procedures that DOHMH adopted in 2003 concerning restaurant inspections in New York City. (*Id.* ¶ 1.) Defendants are DOHMH, its Commissioner, and three of its policy-level employees responsible for restaurant inspections, including the Director of DOHMH's Bureau of Food Safety and Community Sanitation (the "Bureau"). (*Id.* ¶ 6.) The Amended Complaint pleads a violation of Fourteenth Amendment substantive due process and a supplemental cause of action under N.Y.

C.P.L.R. 7803(3), which alleges that DOHMH failed to comply with the City Administrative Procedure Act ("CAPA"). (*Id.* ¶¶ 72–76.) The Amended Complaint challenges certain changes in DOHMH's restaurant inspection guidelines and procedures and specific amendments to the New York City Health Code. Specifically, plaintiffs challenge the following:

### 1. *New Evaluation and Inspection Procedures*

In 2003, the Bureau published and publicly disseminated a booklet entitled "Important Information for Food Service Establishments" (the "Booklet"). The Booklet explains that, as of March 24, 2003, "the standards for how an inspection will be evaluated are changing," and it describes a new scoring system for violations. (*See* Declaration of Deborah Rand, Esq., dated Oct. 9, 2003 ("Rand Decl."), Ex. A at 5.) In other words, the Booklet provides new guidelines for inspectors in enforcing the provisions of the New York City Health Code. (Transcript of Oral Argument, dated Dec. 5, 2003 ("Tr."), at 11.)

Plaintiffs complain that these changes in inspection guidelines and violation scoring, which they call the "New Inspection Rules," were not adopted by the Board of Health as amendments to the New York City Health Code or by DOHMH as departmental regulations under CAPA. (Pl.'s Mem. at 2.) According to plaintiffs, these changes "were adopted in large part to produce revenue for the City" (*id.*) and altered the process of restaurant inspection and violation enforcement in three respects.

First, the new guidelines call for the "ungrouping" of violations. Previously, multiple instances of a specific problem were grouped and cited as one violation. For example, plaintiffs claim that if an inspector observed peeling paint in four different locations within a basement storage area, the inspector would have listed the peeling paint as one facility maintenance violation. Now, "[a] point value [is] assessed for each violation," such that the peeling paint must be listed as four separate violations. (Rand Decl., Ex. A at 2) (emphasis in original).

Second, the Booklet announced a system of "condition levels" to determine how many points are to be assessed for specific violations. Condition levels range from I to V, with Condition I being the lowest level and Condition V being the highest. (*Id.* at 4.) As an example, one instance of insufficient food heating is a Condition I violation and carries seven points. A second instance makes it a Condition II violation that carries eight points. A third instance makes it a Condition III violation that carries nine points, and a fourth instance is a Condition IV violation carrying ten points. (*Id.*) Thus, if four different food items are insufficiently heated, that is a Condition IV violation. (*Id.* at 4–5.) If an inspector assesses twenty-eight or more points in violations, then the restaurant fails the inspection. (*Id.* at 4.) Previously, a restaurant failed an inspection if it had four "critical" violations or five "general" violations. (Declaration of Robert Hermann, Esq., dated Nov. 6, 2003 ("Hermann Decl."), Ex. A at 132.)

Finally, the Booklet elevated at least eighteen types of violations from "general" to "critical," meaning that those violations now carry more points and larger fines. Examples are eating or drinking in a dishwashing area and placing a food thermometer on a table, both of which now carry eight points. (Amended Compl. ¶¶ 28–30.) Because of this change, some restaurants may now fail an inspection and be fined, where before they would have passed the inspection and not received a fine.

2. *The Transfer Rule under New York City Health Code § 81.05(c)*

24 RCNY Health Code § 81.05(c), as amended on February 13, 2003, states in pertinent part:

> [N]o person shall operate a [restaurant] without a permit therefore issued by the Department. An application for a permit shall be submitted to the Department. A request for a pre-permitting inspection shall be submitted to the Department subsequent to the filing of such application, *but not less than 21 days before starting operation of such [restaurant]*. (emphasis added.)

This 21–day Transfer Rule, which was adopted pursuant to CAPA, applies to new owners and operators to whom no permit has yet been issued, and not to holders of existing DOHMH permits. According to plaintiffs, this new rule requires a restaurant to close for at least three weeks when ownership changes hands, until a new inspection and permit can be obtained. Plaintiffs argue that the rule lacks proper justification and that it "substantially, adversely affect[s] how much money every restaurant in New York City takes in, and how readily and at what price it may be sold or assigned to new owners." (Pl.'s Mem. at 9–10; *see also* Amended Compl. ¶¶ 70–71.)

3. *Higher Penalties Imposed by Administrative Tribunal for Health Code Violations*

DOHMH operates an Administrative Tribunal, made up primarily of private lawyers hired on a per-diem basis, which determines violations and assesses penalties in connection with restaurant inspections. (Amended Compl. ¶ 50.) According to plaintiffs, the tribunal's members are monitored by the Bureau's staff, "are beholden to the Bureau for their employment," and as a result are "biased in its favor and lacking in independence." (*Id.* ¶¶ 51–53, 55.) Plaintiffs also maintain that the Bureau has provided members of the Administrative Tribunal with a detailed written schedule of proposed fines "which has not been formally adopted by the Department or publicly disseminated by it." (Pl.'s Mem. at 8.) They further claim that the proposed fines "are much heavier than the ones formerly imposed." (*Id.*)

4. *Public Access to Information Concerning Health Code Violations*

When a restaurant receives a violation, the information is posted on the Bureau's website (http://www.nyc.gov/html/doh/html/rii/index.html), which is accessible by any member of the public. According to plaintiffs, this is true even if the violation was already cured (for example, by removing a food thermometer from a table in the inspector's presence), and the information remains on the website until a re-inspection takes place, "which may take months." (Pl.'s Mem. at 9.) Plaintiffs claim that, since restaurants are now being assessed more violations and are failing more inspections under the new guidelines, they are being subjected to increased "derogatory publicity" on the website. (Amended Compl. ¶ 65.) Thus, plaintiffs argue that use of the website "compounds and aggravates the denial of due process effected by the New Inspection Rules." (Pl.'s Mem. at 34 n. 21.)

## DISCUSSION

A. *Standard for Motions to Dismiss*

A motion to dismiss is properly granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, the

court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62 (2d Cir.1997). When considering a motion to dismiss for failure to state a claim, the court considers the facts as set forth in the complaint, as well as documents incorporated by reference therein. *Automated Salvage Transport, Inc. v. Wheelabrator Envl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir. 1998).

## B. *42 U.S.C. § 1983*

Section 1983 imposes liability on "any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by any federal law." *Cespedes v. Coughlin,* 956 F.Supp. 454, 464 (S.D.N.Y.1997) (quoting *Campo v. Keane,* 913 F.Supp. 814, 818 (S.D.N.Y.1996)). Section 1983 creates no substantive rights but merely provides the vehicle whereby federal rights elsewhere or otherwise conferred may be vindicated. *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *See also Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere").

■ Plaintiffs' claim under Section 1983 is that:

> The New Inspection Rules, along with the Transfer Rules and the publicity policies of the Department, deprive the owners of restaurants in New York City, including the named plaintiffs, of the property interests they possess under New York law in continuing to conduct business at the restaurants they own and operate pursuant to municipal permits, without being subjected to un-

warranted closure of their premises, excessive fines or derogatory public information which result from inspection procedures, enforcement policies and administrative fact-finding that are unauthorized, arbitrary, oppressive and egregious, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

(Amended Compl. ¶ 72.) In other words, plaintiffs assert a violation of their right to substantive due process, which sets "an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999). *See also County of Sacramento v. Lewis,* 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (the "touchstone of due process is protection of the individual against ... the exercise of power without any reasonable justification in the service of a legitimate governmental objective") (internal quotations and citation omitted); *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("The due process clause was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression") (internal quotations and citation omitted).

■ In the context of administrative actions, substantive due process rights are violated by conduct that deprives one of a constitutionally protected property interest and is "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale,* 170 F.3d at 263. "Courts often note that such gross abuse occurs only" where the challenged government action "shocks the conscience." *Rackley v. City of New York,* 186 F.Supp.2d 466, 479 (S.D.N.Y.2002) (citing cases). *See also Wantanabe Realty Corp. v. City of New York,* —— F.Supp.2d ——, ——, 2003 WL 21543841, at *11 (S.D.N.Y.

2003) (explaining that substantive due process "is limited to 'conduct "that *shocks the conscience*" and violates the "decencies of civilized conduct"'") (emphasis added) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *County of Sacramento,* 523 U.S. at 846, 118 S.Ct. 1708); *Padberg v. McGrath–McKechnie,* 203 F.Supp.2d 261, 283 (E.D.N.Y.2002) ("the protections of substantive due process are limited to government action that is 'arbitrary, *conscience-shocking,* or oppressive in a constitutional sense . . . .'") (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994)) (emphasis added), *aff'd,* 60 Fed.Appx. 861, 2003 WL 1191179 (2d Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 436, 157 L.Ed.2d 313 (2003).[1] The Supreme Court has explained that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). It has also cautioned that the due process clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). *See also Natale* 170 F.3d at 263 (explaining that substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action"); *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 145 (2d Cir.1994) ("Overzealous or erroneous government

---

1. Plaintiffs attempt to draw a distinction between the standard applicable to "individual determinations" and that applicable to "across-the board municipal policies," suggesting that the "shock the conscience" standard applies only to individual agency determinations, and that across-the-board policy shifts are subject to a lower "reasonable basis" standard. (*See* Pl.'s Mem. at 24–25.) However, no such distinction appears in the case law. *See Padberg,* 203 F.Supp.2d at 283 (applying the "shock the conscience" standard to across-the-board agency initiative).

Plaintiffs also argue that the court should not apply the "shock the conscience" standard here, but rather should apply a "less restrictive" standard, because (a) the Supreme Court and Second Circuit cases addressing substantive due process claims in the administrative context have not used the specific "shock the conscience" language, and (b) unlike many of the cases applying the "gross abuse of governmental authority" standard, which plaintiffs claim is slightly less stringent than the "shock the conscience" standard, this case does not involve federal review of local land use decisions, which according to plaintiffs, is "uniquely disfavored in federal court." (Letter of Robert H. Hermann, Esq., dated Dec. 8, 2002). However, courts appear to use the "shock the conscience," "gross abuse of governmental authority" and "egregious and arbitrary" language interchangeably (*see, e.g., Rackley,* 186 F.Supp.2d at 480) (describing the applicable standard, in case concerning City policy of seizing vehicles for unpaid parking tickets, as whether the officials' actions "served no legitimate state interest" and "shock the conscience because of their arbitrariness or outrageousness"); *Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 449 (S.D.N.Y.1998) (stating, in zoning case, that "[s]ubstantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . .'") (quoting *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995)), *aff'd,* 182 F.3d 899 (2d Cir.1999), and this court fails to see any meaningful distinction between those standards. Moreover, plaintiffs cite no authority for the proposition that administrative agency decisions or policies not involving land use are subject to a lower substantive due process standard. In fact, this court's decision in *Padberg,* applying the "shock the conscience" standard to an across-the-board administrative agency policy not involving land use, directly contradicts that argument. At any rate, as explained *infra,* plaintiffs do not state a substantive due process claim, regardless of the exact terminology used to describe the applicable standard.

action alone does not give rise to a constitutional violation"); *Padberg*, 203 F.Supp.2d at 283 (protections of substantive due process do not apply to government action that is merely " 'incorrect·or ill-advised' ") (quoting *Lowrance*, 20 F.3d at 537).

Plaintiffs' substantive due process argument is threefold. They argue that defendants violated their due process rights by: (1) adopting procedures that were *ultra vires*, because either legislation or formal rule-making was required,[2] and (2) were motivated not by public health considerations but by a desire to generate revenue,[3] and (3) have had or will have the effect of costing plaintiffs more money or depriving them of their ability to conduct business. (*See* Tr. at 50–51.) Plaintiffs concede, however, that none of these reasons, independently, would satisfy the requirements for a substantive due process claim. (*Id.* at 51.) Rather, plaintiffs argue, it is the combination of these factors that causes defendants' actions to rise to the level of a due process violation.

As an initial matter, plaintiffs' "combination of factors" theory appears novel. They cite no authority for the proposition that a series of elements, no one of which would itself constitute a substantive due process violation, can combine to create such a violation. Regardless, even accepting plaintiffs' theory, plaintiffs' complaint does not allege facts demonstrating government action that is "outrageously arbitrary," "conscience shocking" or a "gross abuse of governmental authority."

As Judge Kaplan recently explained in *Wantanabe*, a court addressing a substantive due process claim must differentiate "conduct that is merely wrongful and arbitrary from that which is so shocking as to implicate the Due Process Clause." *Wantanabe*, —— F.Supp.2d at ——, 2003 WL 21543841, at *11. Examples of conduct that courts have deemed so grossly abusive or egregious as to violate the Due Process Clause in the context of administrative agency actions are few and far between. In *Wantanabe*, the court found an issue of fact as to whether the defendants' actions were "outrageously arbitrary." *Id.* —— F.Supp.2d at ——, 2003 WL 21543841 at *12. In that case, the plaintiffs, owners of an idle roller coaster in Coney Island, alleged that the Mayor ordered the City to demolish the roller coaster without any reasonable justification or prior notice in order to accommodate the owners of a professional baseball team, who wanted to build a minor league stadium on the site. The court rejected the plaintiffs' argument that the defendants had failed to comply with the Unsafe Buildings Procedures in the New York City Administrative Code, holding that "violation of state laws and regulations alone is insufficient" to make out a substantive due process claim. *Id.* —— F.Supp.2d at ——, 2003 WL 21543841 at *11. However, given evidence that the engineer who had recommended demolition was not qualified to make a determination regarding the structural integrity of the roller coaster, making the assessment suspect, the court held that it could not "exclude the possibility" that the issuance of the declaration requiring demolition was "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Id.* It therefore declined to grant summary judgment on the substantive due process claim.

---

**2.** This argument obviously does not apply to the Transfer Rule, 24 RCNY Health Code § 81.05(c), which was ·adopted pursuant to CAPA.

**3.** This argument does not apply to the posting of health code violations on the Bureau's website, which is not alleged to produce revenue.

Other than *Wantanabe,* however, plaintiffs cite no case upholding a substantive due process claim in the administrative context. Moreover, *Wantanabe* is clearly distinguishable from the instant case, in that *Wantanabe* concerned intentional action taken against an individual property owner, arguably without any reasonable justification. *See id.* —— F.Supp.2d at ——, 2003 WL 21543841 at *12 (noting that, "[w]hile the precise level of culpability required in a case like this perhaps is not entirely clear, it is safe to say that intentional conduct that otherwise is sufficiently egregious would be sufficient while merely negligent conduct would not").

This case is more analogous to *Padberg v. McGrath–McKechnie,* 203 F.Supp.2d 261. The plaintiffs in *Padberg* were taxicab drivers who were challenging a new City initiative called "Operation Refusal," which increased disciplinary sanctions against drivers who refused service to passengers based on their race. The plaintiffs argued, *inter alia,* that the Mayor and Chairperson of the Taxi and Limousine Commission ("TLC") had circumvented the procedures in the New York City Charter by initiating the new policy without a full vote of the TLC. *Id.* at 283. Addressing plaintiffs' substantive due process claim, the court held that, even if the New York City Charter did require a full vote of the TLC, the Chairperson "had at least a reasonable basis to believe that she did possess the authority to initiate Operation Refusal" under the City Charter, and that "[h]er action, *even if unauthorized* by the Charter, [could not] be considered a 'gross abuse' of her power rising to the level of a Constitutional violation." (*Id.* at 284) (citing *Natale,* 170 F.3d at 263, and *Amsden v. Moran,* 904 F.2d 748, 757 (1st Cir.1990)) (emphasis added).

The court also rejected the plaintiffs' argument that the new policy violated their substantive due process rights because it was unauthorized under the City Administrative Code. The court accepted the plaintiffs' contention that the policy was unauthorized, stating: "[i]t may indeed be true that . . . the Administrative Code limits the authority of the TLC to impose such penalties." *Id.* at 285. However, it went on to hold that suspending or revoking licenses for race-based service refusals, *even if unauthorized under the Code,* was "not arbitrary or irrational and therefore did not violate substantive due process." *Id.*

Thus, both *Wantanabe* and *Padberg* held that the unauthorized nature of a government action will not cause it to rise to the level of a substantive due process violation. Likewise, in this case, the court need not address plaintiffs' contention that the new inspection and evaluation procedures and higher penalties are unauthorized under the New York City Health Code or CAPA. Even if they are, the matter is correctable in state court and does not constitute action that is abusive in a constitutional sense.

Plaintiffs attempt to distinguish *Padberg* by arguing that the motivation for the City initiative in that case, *i.e.* combating race discrimination, was laudable, whereas the alleged motivation in this case, increasing revenues, is not. However, the court in *Padberg* did not reflect on the motivation underlying the City's actions in that case, other than to say that the officials' motives were "legitimate." *Padberg,* 203 F.Supp.2d at 284. Moreover, plaintiffs concede that revenue production is, and always has been, one legitimate goal of the restaurant inspection rules. (Tr. at 43.) Finally, it is beyond question that the rules have a strong public health component. It is certainly not "conscience-shocking" or a "gross abuse of government authority" to increase penalties and administrative fines

for health code violations, thereby elevating the deterrent value of those penalties and fines.[4]

■ Even assuming, without ruling, that plaintiffs possess constitutionally protected property rights that are affected by the government actions of which they complain (a claim defendants dispute), substantive due process does not protect against government action that is merely "incorrect or ill-advised." Thus, even if DOHMH's motivations for adopting the new procedures were debatable or arguably unwise, it cannot be said that DOHMH was exercising its power in an oppressive way, that the actions of which plaintiffs complain violate the "decencies of civilized conduct," or that the procedures and guidelines in the Booklet are "without any reasonable justification in the service of a legitimate governmental objective." Plaintiffs' Amended Complaint therefore fails to state a cause of action for a substantive due process violation.

### C. The State Law Claim

The Amended Complaint alleges, as a matter of state law, that the changes in inspection procedures and guidelines constitute "rules" that should have been promulgated pursuant to CAPA. CAPA § 1041(5)(a) defines a "rule" as "any statement or communication which prescribes (i) standards which, if violated, may result in a sanction or penalty ... [or] (iii) standards for the issuance, suspension or revocation of a license or permit...." According to plaintiffs, the new guidelines and procedures are "rules" because they establish "standards which, if violated, may result in a sanction or penalty" and prescribe

"standards for the issuance, suspension or revocation of a license or permit...." (Pl.'s Mem. at 14.) Defendants deny that the new inspection procedures and guidelines are "rules" under CAPA, arguing that the enhanced inspection procedures set forth in the Booklet "merely provide[ ] guidance for [DOHMH's] Public Health Sanitarians to evaluate on-site conditions that are in violation of existing Health Code requirements." (Def.'s Mem. at 19.)

■ 28 U.S.C. § 1367(a), concerning supplemental jurisdiction, states in pertinent part:

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Section (c) of that rule lists the circumstances in which a court may decline to exercise supplemental jurisdiction over a claim. Those circumstances are: (1) where the claim "raises a novel or complex issue of State law;" (2) where the claim "substantially predominates over the claim or claims over which the district court has original jurisdiction;" (3) *where the district court has dismissed all claims over which it has original jurisdiction;* or (4) in "exceptional circumstances, there are other compelling reasons for declining jurisdiction." (emphasis added.) As plaintiffs concede, when courts dismiss federal causes of action, they generally exercise their discretion in favor of dismissing the supplemen-

---

4. In fact, the Booklet, which is incorporated by reference into the Amended Complaint, states that the new guidelines were designed "to give food service operators a clearer un-

derstanding of what they must do to prevent disease and ensure compliance with New York City Health Code regulations." (Rand Decl., Ex. A at 3.)

tal state law claims as well. (*See* Pl.'s Mem. at 35.) This is especially true where the supplemental state law claim requires interpretation or analysis of local law. *See Seabrook v. Jacobson,* 153 F.3d 70, 71–73 (2d Cir.1998) (declining supplemental jurisdiction over question of state law which "require[d] a balancing of numerous important policies of [local] government"). *See also Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 505 (2d Cir.2001) ("Litigants do themselves a disservice when they attempt to clothe state causes of action in the garb of a federal claim while ignoring available state remedies").

Plaintiffs' state law claim requires an interpretation and analysis of municipal law, specifically the question of what constitutes a "rule" under CAPA. In addition, this case is still at a nascent stage, with no discovery having taken place. The court therefore declines to exercise supplemental jurisdiction.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss plaintiffs' substantive due process claim is granted. The court declines to exercise supplemental jurisdiction over plaintiffs' state law claim.

SO ORDERED.